**Lloyd F. ADAMS, Appellant,**

v.

**Roy DAVIS, Regina Davis, and Stephen Harris, Individually and as Administrator of the Estate of Lydia Harris, Deceased, Appellees.**

Court of Appeals of Kentucky.

March 9, 1979.

William Mellor, Henry Triplett, Louisville, Raymond Overstreet, Liberty, Spragens, Smith & Higdon, Lebanon, for Lloyd F. Adams.

William A. Miller, Louisville, Morris R. Butler, Greensburg, Fred Faulkner, Jr., Campbellsville, for Roy Davis and Regina Davis.

Robert L. Dowell, Greensburg, William A. Miller, Louisville, Fred Faulkner, Jr., Campbellsville, for Stephen Harris, Individually and as Administrator of the Estate of Lydia Harris, Deceased.

Before GANT, COOPER and WILHOIT, JJ.

GANT, Judge.

On May 27, 1973, a tractor-trailer driven by appellant Adams collided with an auto driven by appellee Roy Davis, containing passengers Stephen Harris, Lydia Harris, and Regina Davis. Lydia Harris died as a result of the accident and the other three occupants of the car sustained injuries. Both the Davises and Stephen Harris, individually and as administrator of his wife's estate, brought law suits arising from the accident. The two actions were consolidated for trial on September 27 and 28, 1977. A jury found Adams liable to the plaintiffs and judgment was entered on the jury's verdict. On appeal, Adams asserts four grounds that he contends entitle him to a new trial.

I. *Improper Conduct of Juror*—A juror in this case apparently approached the appellant on two occasions during the same day of trial. The conversations that ensued are described in Adams's affidavit as follows:

### FIRST CONVERSATION

JUROR: Do you have liability insurance on your truck?

DEFENDANT: Yes, but I don't know if I have enough.

JUROR: I know how expensive that can be for a person who is in business for himself.

### SECOND CONVERSATION

JUROR: Are you still driving a truck?

DEFENDANT: No, I got out.

JUROR: Where are you working now?

DEFENDANT: I am working at Firestone in Danville.

JUROR: I wish I could talk with you longer but I can't right now.

Adams states that only on being questioned by his attorney after the verdict had been reached did he report these conversations because he did not realize the significance of them. Adams's motion for a new trial based on this occurrence was denied. Although the actions of the juror in this case were highly improper and in direct contradiction to the instructions of the trial judge, appellant's request for a new trial cannot be granted for two reasons. First, to allow a defendant to participate in misconduct, knowingly withhold information about it until a verdict is reached, and then complain of juror misconduct could subject every jury verdict to attack. The complaint must come before the jury is dismissed. *Cf. Vanceburg Tel. Co. v. Bevis*, 148 Ky. 285, 146 S.W. 420 (1912); and *Hatfield v. Commonwealth*, 180 Ky. 642, 645, 203 S.W. 562, 563 (1918). Appellant's lack of knowledge of legal proceedings and technicalities is understandable, but this is the reason he obtained counsel to represent him. Appellant here had ample opportunity to discuss this matter with his attorney and chose not to do so. Although we will not speculate as to motive, if any, for appellant's silence,

suffice it to say that the granting of a new trial under these circumstances would encourage fraud on the part of disgruntled litigants and would be totally contrary to the law in this jurisdiction.

█ Further, appellant has shown no prejudice resulting from the juror's conversation with him. If anything, the nature of the juror's remarks indicates his sympathy with appellant's position, and appellant's reply to the juror's inquiry was that he did not feel that he had enough insurance and seems more likely to create prejudice to the plaintiffs in this action. Insurance is a fact of life in our society and jurors are cognizant that most businessmen and operators of vehicles carry liability insurance of some kind. Under the present facts, including the fact that the appellant himself imparted this information to the juror, there is no showing of prejudice to warrant the granting of a new trial.

II. *Testimony of David Dobson, Vocational Expert*—Appellant maintains that appellee's expert witness, David Dobson, vocational expert, should not have been allowed to testify as to the employment prospects of appellee Davis because his opinion was based on an out-of-court personal interview with Davis, specifically, Davis's statements concerning pain and limitation of movement he was suffering. Dobson testified that his opinion that Davis was unemployable was based both on his interview with Davis and the deposition of Dr. Keisler, which was admitted into evidence, and that he read the doctor's deposition only to ascertain if the doctor's evaluation agreed with the patient's own evaluation of his condition. The Supreme Court of Kentucky held in *Buckler v. Commonwealth*, Ky., 541 S.W.2d 935 (1976), that expert testimony may be based on information obtained from third persons if it is of the type customarily relied upon by other experts in the profession. If information from third persons may be used, obviously information obtained from the party himself—who is before the court and has given identical information into evidence from the stand—may be used. Dobson testified that he usually re-

lies on a personal interview with his clients. At TR p. 206 he states:

Q. In forming an evaluation is it necessary to interview the person to determine what complaints they have as well as to physically look at them yourself?

A. Yes, sir, it is impossible to do a vocational evaluation without having an understanding of the education of the person, his physical condition, his work history, and any pertinent information which may help in determining what work skills a person has and what kind of work he can do.

█ Appellant likens the vocational expert to a physician and states that the basis for his testimony is unacceptable under the rule that a physician who examines a patient solely for purposes of testifying may not base his opinion on the patient's case history. However, *Big Sandy Community Action Program v. Chaffins*, Ky., 502 S.W.2d 526 (1973), held that a testifying physician may take into account the subjective symptomology of the patient as distinguished from the case history. The only "case history" offered by Davis to Dobson was his work history, which is objective and not disputed. Subjective statements as to pain and limitation of movement at the time of the interview are a proper basis for Dobson's testimony under *Big Sandy, supra*.

Additional support for admitting this testimony comes from the fact that Davis personally testified prior to Dobson's taking the stand. Thus, the jury had ample opportunity to hear all the subjective symptoms firsthand, to observe Davis and judge his credibility for themselves. Any doubt left in the minds of the jury as to the basis of Dobson's opinion was surely erased by the skillful cross-examination by appellant's counsel, who elicited the admission from Dobson that, based solely on Dr. Keisler's deposition, Davis would not be totally unemployable, while based on Davis's own statements, he would be. There was no error in admitting Dobson's expert opinion testimony.

III. *Testimony of Dr. Carl Abner, Economist, as to "Potential Cumulative Wage*

Loss" Resulting from Death of Lydia Harris—Dr. Abner, expert witness for plaintiff/appellee, based his calculations on the assumption that Lydia Harris would work until age 65 at minimum wage and would earn a total of $208,104 from date of trial to age 65. Lost earnings of decedent at minimum wage of $1.60 per hour from date of death to date of trial were calculated at $13,312, for a total of $221,416. The amount of judgment for the estate of Lydia Harris was $200,000 for "destruction of power to labor and earn money."

Although the parties stipulated as to decedent's life expectancy, appellant objected to Dr. Abner's basing his calculations on the assumption that her work-life expectancy would extend to age 65. Obviously this is pure speculation on the part of the witness. Decedent may have decided not to work past age 25 or she may have worked to age 90. Some assumptions must be made, however, to be able to calculate damages in an action for wrongful death. As stated in *Americo Marketing Co. of Memphis, Inc. v. Myers*, 494 F.2d 904 (1974), also an automobile accident case, applying Kentucky law:

> This witness was qualified as an economist and very carefully testified concerning the methods which he used in reaching his estimates of future earnings. He also specified a number of publications which he stated are generally relied upon by economists in making similar calculations and which he referred to in reaching independent conclusions with respect to each of the decedents. The measure of damages in wrongful death actions in Kentucky is the value of the destruction of the power of the decedent to earn money, not the destruction of income from a particular job or occupation. *Roland v. Beckham*, 408 S.W.2d 628 (Ky. 1966). The award in such a case is not limited to the past earnings of the decedent, as these may not be indicative of his power to earn. *Humble v. Mountain State Construction Co.*, 441 F.2d 816 (6th Cir. 1971). *Under this rule, there is necessarily an element of speculation involved in determining the power to earn money, particularly in the case of children and others who have not established a history of earnings. Yet the Kentucky courts have consistently upheld verdicts in such cases in the face of argument that they are based on speculation.* See, e. g. *Rice v. Rizk*, 453 S.W.2d 732 (Ky.1970). Under the Kentucky rule of damages a great deal of latitude must necessarily be allowed in wrongful death cases. *City of Louisville v. Stuckenborg*, 438 S.W.2d 94 (Ky.1968). *Id.*, page 913. (Emphasis added).

■ Dr. Abner explained that the table used by him represented no one individual but average statistics valid only for large groups. He also testified that his figures would be incorrect if the decedent left her employment at any time before age 65. With this knowledge, the jury was able to give whatever weight it wished to his testimony.

■ IV. *Failure To Admit Evidence of Stephen Harris's Remarriage*—The measure of damages for a wrongful death in this jurisdiction is the value of the destruction of the power of the decedent to earn money. The existence and status of survivors has no bearing on the calculation of this value. Thus, the evidence of remarriage of a surviving spouse is incompetent for any purpose in a wrongful death action. *See McGuire v. East Ky. Beverage Co.*, Ky., 238 S.W.2d 1020 (1951). The reason for this rule is the obvious prejudice to the plaintiff that would be impossible to overcome. Appellant urges that this evidence be admitted only upon retrial of the wrongful death action and then only in the event that evidence as to decedent's value as a homemaker be introduced. This "equivalent value" testimony was stricken from the record at trial and the jury admonished not to consider it so there is no need to discuss contingencies here. There is no merit to appellant's claim that evidence of Stephen Harris's remarriage affects the legitimacy of his claim for bodily injury and appellant gives no authority or basis for that claim.

The judgment of the trial court is affirmed.

All concur.