MATTHEW BLANCHARD ET AL. *v.*
CITY OF BRIDGEPORT ET AL.
(10982)

PETERS, HEALEY, PARSKEY, SHEA and DALY, Js.

Argued June 8—decision released August 2, 1983

*Louis Stein,* assistant city attorney, with whom, on the brief, was *Richard Scalo,* city attorney, for the appellants-appellees (defendants).

*Harold L. Rosnick,* with whom were *Diane Hornstein,* law student intern, and, on the brief, *Sigmund L. Miller,* for the appellees-appellants (plaintiffs).

PARSKEY, J. The plaintiff, Matthew Blanchard, age 2, was mauled by a leopard at the Bridgeport Zoo. This action was instituted by Matthew and his mother against Richard Sweeney, the zoo director, and Antonio Ortez, who had certain responsibilities in the bird and mammal building of the zoo, and against the city of Bridgeport (city). The action against Sweeney and Ortez is based on negligence. The action against the city is by way of indemnity for the negligence of Sweeney and Ortez, and on the basis of nuisance and absolute liability. The complaint is in ten counts, six in negligence, two in nuisance and two in absolute liability. The trial court directed a verdict for the city with respect to the counts in absolute liability and submitted the remaining counts to the jury. The jury returned a general verdict for the plaintiffs against all three defendants in the amount of $125,000 for Matthew and $15,000 for his mother. The court accepted the verdicts and ordered a remittitur of $8766 on the $15,000 verdict, which Matthew's mother accepted. From the judgment on the plaintiffs' verdicts the defendants have appealed. From the judgment on the directed verdict the plaintiffs have cross appealed.

In their appeal the defendants principally assert that the verdicts are against the evidence and that Matthew's verdict is excessive. They also challenge the court's evidential rulings with respect to the admission of certain photographs, of statements by the defendant Ortez, and of certain lay and expert testimony.

## THE VERDICT

We first consider whether the verdict is supported by the evidence on the negligence counts. The jury

could reasonably have found the following facts: On October 12, 1975, the plaintiff Matthew Blanchard, age 2, accompanied by his father, was visiting the Beardsley Zoological Gardens, a public zoo created, owned, operated and maintained by the defendant city of Bridgeport. The zoo was open to the general public for their use and enjoyment, and visitors, many of whom were very young children, were permitted and invited into the bird and mammal building to observe a leopard exhibit. While Matthew and his father were in another part of the building, Matthew separated from his father and thereafter approached the barrier wall outside the leopard cage. The barrier wall consisted of metal screen or mesh on the bottom and plexiglass on the top. There was a space of seven and three-quarters inches between the bottom of the barrier and the floor. Matthew crawled underneath the barrier, stood up and turned his back to the cage. At that point another person banged on the plexiglass to get Matthew's attention. Matthew took a couple of steps backward, at which point a leopard suddenly reached out through the bars, grabbed Matthew with his paw and pulled him toward the cage. The leopard then grabbed Matthew under the neck with his other paw and lifted him off the ground in an attempt to pull him into the cage. While Matthew was off the ground, the leopard mauled him across the face and scalp with his free paw. Matthew's father then reached under the barrier, grabbed Matthew's leg and pulled him away from the leopard. Matthew sustained severe injuries in the encounter.

The defendant Antonio C. Ortez was employed by the city within the department of parks and recreation. While on duty within the bird and mammal building Ortez had the responsibility to make sure that the public did not harm the animals and that the animals did not harm the people. He was especially responsible for

keeping an eye out for children because of their lack of appreciation of danger. He further had the duty either to correct problems that arose or to report them to his supervisor. In the eight months he had worked at the zoo before the day of the accident Ortez had, on four separate occasions, removed other children from under the barrier after they had crawled through the opening towards the leopard. He never reported these incidents to his foreman or anyone else in charge even though he was under specific instructions to do so. Ortez was on duty within the bird and mammal building on the date of the accident and saw the leopard mauling Matthew.

Ortez was under the supervision and direction of Richard G. Sweeney, the zoo manager. As zoo manager Sweeney was required to be thoroughly familiar with modern zoo management, to direct, supervise and participate in the operation and maintenance of the zoo, including recommending and supervising the making of necessary repairs and improvements.

On October 12, 1975, there were no warning signs within the bird and mammal building with respect to the leopard exhibit nor were there warning signs regarding the danger of children going under the barrier. In addition, although two guards were reasonably necessary within the bird and mammal building, at the time of the accident only Ortez was on duty.

In front of the leopard case there is a wall barrier consisting of plexiglass and wire screen. Between the bottom of the screen and the floor is an open area measuring seven and three-quarters inches. This area was left open to enable attendants to retrieve any debris that may have been tossed into the area between the cage and the wall barrier by visitors. The open area was large enough so that a small child could crawl

through it. The open area would have been readily apparent to anyone upon inspection, including Ortez and Sweeney.

Both Ortez and Sweeney had a special responsibility because the animal under their control was a wild animal. There was expert testimony that a leopard is a natural predator of humans and, whether in the wild or caged, is dangerous, and that the natural instinct of a caged leopard toward an approaching human would be to attack. Because of the very nature of the animal in their charge both Sweeney, as zoo manager, and Ortez, as his assistant, had a duty to take all reasonable precautions and to make all reasonable inspections to discover possible defective or dangerous conditions so as to assure the safety of visitors to the zoo, especially to that part of the zoo housing wild and ferocious animals. The degree of care to be exercised by keepers of wild animals to protect visitors from harm must, at the very least, be equal to the coiled spring danger that lurks within the cage.

Because there was ample evidence from which the jury could conclude that either Ortez or Sweeney or both were negligent and that such negligence was the proximate cause of Matthew's injury and of his mother's medical expenses, the trial court's refusal to set aside the verdicts was justified.[1]

We next consider whether, based on the evidence, the verdict was excessive. Matthew sustained a four

---

[1] Additionally, the defendants challenge the court's charge on nuisance. We do not address this challenge because there being no error on at least one of the negligence counts on behalf of each plaintiff that count is sufficient to support the general verdict. *Goodman* v. *Metallic Ladder Mfg. Corporation,* 181 Conn. 62, 65, 434 A.2d 324 (1980). Because we find no error in respect to any assignments of error on the appeal, it is unnecessary for us to address the plaintiffs' claims on the cross appeal. *Westport* v. *Norwalk,* 167 Conn. 151, 164, 355 A.2d 25 (1974).

and one-half inch laceration on the left side of his scalp down to his skull, a one and one-half inch avulsion on his left cheek, a two and one-half inch laceration extending from the left upper eyelid over to the nose area, a two inch laceration on the right front of his scalp, a two and one-half inch laceration on his right cheek and a three inch laceration on his left forehead. In addition, a portion of his ear was torn away. Matthew was rushed to Bridgeport Hospital where he underwent emergency plastic surgery under general anesthesia. Surgery required 110 sutures. Matthew has permanent scars below his left ear and on his right cheek, forehead, left upper eyelid to the top of his nose and scalp totaling twenty inches.

Matthew is a sensitive boy who cares how he looks and is embarrassed by his scars. His scars turn purple when it is cold and turn red from the sun. When his hair is wet from swimming or a shower, one can see the scars on the top of his head. Matthew is predisposed to a receding hair line, hair thinning and baldness. The scars on his forehead and scalp will become progressively more noticeable as he grows older. Matthew is now afraid of animals.

Future plastic surgery under general anesthesia and involving a two to three day hospital admission will be required at a cost of $4500. Even with future surgery Matthew will still be left with permanent scarring. Matthew must be concerned not only about the results of further surgery but also its attendant risks and complications. The accident has been a traumatic event in Matthew's life and it has affected and will in the future affect his life.

It is rather obvious that Matthew's injuries are serious and extensive. We agree with the trial court that there is nothing in Matthew's award "that smacks

of partiality, prejudice or mistake or that it is plainly excessive" and therefore it cannot be disturbed. *Pisel v. Stamford Hospital,* 180 Conn. 314, 343, 430 A.2d 1 (1980).

## THE PHOTOGRAPHS

The plaintiffs offered in evidence two photographs depicting the leopard cage where the accident occurred. The photographs also showed a metal bar across the space through which Matthew had crawled. The bar had been welded into place the day after the accident. Over objection that the photograph, because of the presence of the bar, did not accurately reflect conditions at the time of the accident and the further objection that it was against public policy to admit evidence of repairs to correct allegedly dangerous conditions, the court admitted the photographs solely for the purpose of showing conditions that prevailed at the time of the accident. The court also instructed the jury that they were not to consider the bar with reference to the condition of the barrier in front of the leopard cage on the day of the accident.

The trial court's ruling was correct. Evidence admissible for one purpose but not for another may nevertheless be admitted. McCormick, Evidence (2d Ed.) § 59. The court should, however, caution the jury, as the trial court did here, about the limited purpose of the exhibit. If the danger of the jury's misuse of the evidence for the incompetent purpose is great and its probative use is slight, then the court may exclude the evidence, especially if the point for which the evidence is competent can be proved by other evidence. In this case the bar across the open space had been welded into position the day after the accident. Moreover, the defendants did not request that the bar in the photograph be obscured in some appropriate fashion. At that stage

of the trial and in view of the importance of the open space to the plaintiffs' case the trial court's action was appropriate.

The plaintiff offered and the trial court admitted two photographs of a leopard, presumably in its natural habitat. The leopard in the picture was not involved in the accident and the jury was so instructed. The basis of the offer was to show the jury what a leopard looked like. The trial court has broad discretion with respect to the admission of such evidence. Such evidence is admissible if it will assist the jury in understanding the testimony and if the photograph or pictorial representation fairly represents what it purports to represent. *Katsetos* v. *Nolan,* 170 Conn. 637, 656, 368 A.2d 172 (1976). Except in cases of clear abuse of discretion the admission of such evidence will not be disturbed. There is no basis for reversing the court's ruling in this instance.

### STATEMENTS OF ORTEZ

Alan D. Flynn, a private investigator, testified for the plaintiff that on November 26, 1975, he spoke to a person at the bird and mammal building who identified himself to Flynn as Antonio Ortez and who gave him both an oral and a written statement of the events that he observed on October 12, 1975. The defendants objected to both statements on the ground that other than Ortez's own statement "we don't know how he [Flynn] knew he was talking to Antonio Ortez."

"The statement by a person of his name, like his statement of his age, is in the nature of hearsay evidence in the sense that his source of information is what has been told to him at some time by others, but such statements are universally relied on as a source of knowledge both in the ordinary affairs of life and in the everyday business of the courts." *Toletti* v.

*Bidizcki,* 118 Conn. 531, 534, 173 A. 223 (1934). Although the defendant Ortez was not bound by the statements attributed to him unless there was evidence from which the jury could reasonably find that he was the person who made them, the fact that Flynn had not previously known Ortez did not render the statements inadmissible. Id. The defendants do not question that the content of the statement attributed to Ortez as verified by other testimony provided an adequate basis for finding that Ortez had made it. See *Toletti* v. *Bidizcki,* supra, 534–35.

### TESTIMONY OF LOUIS ASHEN

Louis Ashen testified on behalf of the plaintiffs that he has been in business as an ornamental iron worker since 1954 and that he was familiar with the 1975 prices of labor and material for the installation of iron work. At the plaintiffs' request he went to the bird and mammal building and examined the barrier in front of the leopard cage. He estimated the distance to be spanned for a protection bar to be twenty-seven feet. Over objection he opined that the cost of installing a protective bar below the barrier in front of the leopard cage was less than $100. The testimony was admissible. In the face of evidence of four prior occasions where children had crawled under the barrier it was entirely appropriate for the plaintiffs to demonstrate the feasibility of precautionary measures which might have made the area safer. *Delmore* v. *Polinsky,* 132 Conn. 28, 31, 42 A.2d 349 (1945).

### QUALIFICATIONS OF DR. JOEL SINGER

Joel Singer, a plastic surgeon, testified regarding the hereditary nature of baldness and that, if a person's father has a certain pattern of baldness, his son has a great likelihood of having the same pattern of baldness. The defendants objected on the basis that

Singer was not qualified to testify in the area of baldness. The trial court overruled the defendants' objection.[2]

Singer, a graduate of Yale Medical School, limits his medical practice to the specialty of plastic surgery. Instruction in the cause of baldness was part of Singer's medical training. He treats baldness in his practice and does hair transplants.

The qualifications of an expert presents a preliminary question for the trial judge. Singer's background, experience and training were sufficient to support his testimony concerning the effect of future baldness on Matthew's injuries. See *Hamill* v. *Neikind,* 171 Conn. 357, 362, 370 A.2d 959 (1976).

There is no error.

In this opinion the other judges concurred.

[2] For the first time on appeal the defendants challenge Joel Singer's qualifications to testify with reference to the psychiatric effects of the incident on Matthew. Since the defendants neither objected nor excepted to the admission of this testimony we do not review this claim. Practice Book § 288; *Deedy* v. *Marsden,* 172 Conn. 568, 570, 375 A.2d 1032 (1977).