Owen Mark Sanderson et al., Co-Administrators
(Estate of William Smith) *v.* Steve Snyder
Enterprises, Inc., et al.
(12237)

Healey, Parskey, Shea, Dannehy and Satter, Js.

Argued February 8—decision released April 30, 1985

*Hubert J. Santos,* with whom, on the brief, was *Christopher F. Droney,* for the appellants (plaintiffs).

*John W. Lemega,* with whom, on the brief, was *George D. Royster, Jr.,* for the appellees (defendants).

SHEA, J. In this products liability action a verdict was returned for the named defendant manufacturer and judgment was rendered thereon. On appeal, the plaintiffs, co-administrators of the decedent's estate, claim that the judgment should be overturned because the trial court erred (1) in admitting hearsay statements contained in a deposition offered at trial, (2) in excluding evidence of a subsequent design modification in the product, (3) in denying the plaintiffs' motion in limine relating to evidence of the remarriage of the decedent's wife, and (4) in charging the jury on the issue of contributory negligence on the part of the decedent. We find error and remand for a new trial.

In reaching its verdict, the jury could reasonably have found the following facts: On September 17, 1977, between 6 and 6:30 p.m., the decedent, William Smith, and two companions, Joseph Gorski and Eric McLarney, boarded a plane, piloted by William Sabine, at the Johnnycake Airport in Burlington for the purpose of making a parachute jump into a Waterbury stadium during halftime of a football game as part of an Army National Guard jump demonstration. The decedent included as part of his parachute equipment a Sentinel MK 2000 automatic emergency parachute pack release system given to him by his wife as a Christmas present in 1973 and used by the decedent regularly thereafter. The Sentinel MK 2000 is a device that can sense both the altitude of a parachutist and his rate of descent. When the parachutist's rate of descent has not been slowed by the deployment of his main parachute, the Sentinel MK 2000 is designed automatically to deploy the parachutist's reserve chute at

a critical altitude, usually 1000 feet above ground level. The device must be calibrated before use to take into account the altitude of the anticipated drop zone.

The decedent and one of his companions, Joseph Gorski, had jumped earlier in the day at a Democratic party picnic in Simsbury. The decedent's reserve parachute was not deployed by the Sentinel MK 2000 during that jump. At the picnic, each jumper consumed a ten ounce beer and also some food. The two then drove to the Johnnycake Airport, stopping along the way while each drank two more cans of beer. The decedent and Gorski, joined by McLarney, were served more beer at the airport restaurant before the pilot arrived. The jumpers removed the side door and rear seat of the airplane to facilitate the jump. They then donned and checked their equipment. There was testimony that the decedent calibrated his Sentinel MK 2000 at this time. The three jumpers boarded the plane and the pilot took off.

When the plane reached an altitude of between 700 and 1700 feet, Gorski heard a sharp popping sound, "like a cap pistol, or a 22," and turned to find the decedent attempting to restrain his reserve parachute, which had deployed. Immediately prior to the popping noise, Sabine, the pilot, had seen the decedent adjusting his Sentinel MK 2000. The Sentinel MK 2000 employs an explosive charge to deploy a reserve parachute. There was uncontroverted evidence that the deployment of a parachute inside an airplane is extremely hazardous. The pilot instructed the decedent to jump from the plane, but the decedent refused. Gorski was attempting either to restrain the reserve parachute or to sever it from the decedent when the decedent was pulled out the open side door of the airplane by his reserve chute. The side of the decedent's face was thrown against the side of the plane as he was pulled out the door. The decedent's body was later recovered from a nearby lake. An autopsy revealed that

he had suffered a broken neck, probably when exiting the airplane, which resulted in paralysis and, possibly, loss of consciousness. His death was caused by drowning. The autopsy also revealed that the decedent had .15 mg. per ml. of alcohol in his blood at the time of his death. There was testimony that .10 mg. per ml. is prima facie evidence of intoxication.

The plaintiff co-administrators claimed that the named defendant, Steve Snyder Enterprises, Inc. (hereinafter the defendant), which designed, manufactured and marketed the Sentinel MK 2000, was liable for the death of the decedent upon negligence, implied warranty and strict liability theories. The defendant denied these allegations and proffered the defenses of product misuse, contributory negligence and assumption of risk. The jury found for the defendant.

I

At the trial, the defendant introduced the deposition of the pilot, William Sabine. It was not contested that Sabine was outside the state and not amenable to the subpoena power of the court at the time of trial.[1] The deposition had been noticed and taken by the plaintiffs, who initially sought to introduce portions of the deposition, but withdrew their offer when the trial court ruled that they could not omit other portions that contained hearsay testimony. The plaintiffs later objected

---

[1] Under Practice Book § 248 (1) (d), a deposition may be introduced into evidence at trial if the court finds: "1. that the witness is dead; 2. that the witness is at a greater distance than thirty miles from the place of trial or hearing, or is out of the state and will not return before the termination of the trial or hearing, unless it appears that the absence of the witness was procured by the party offering the deposition; 3. that the witness is unable to attend or testify because of age, illness, infirmity, or imprisonment; 4. that the party offering the deposition has been unable to procure the attendance of the witness by subpoena; 5. that the parties have agreed that the deposition may be so used; 6. upon application and notice, that such exceptional circumstances exist as to make it desirable, in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used."

to this testimony when the defendant offered the deposition.[2] On appeal, the plaintiffs claim they were harmed by the trial court's failure to sustain their objections to this deposition testimony in which Sabine stated that he had been told by a waitress that the decedent and the other jumpers had been served beer at the Johnnycake Airport restaurant. The trial court recognized the statements as hearsay, but admitted them because they had been elicited at the deposition by the plaintiffs, who, the trial court ruled, could not object to their own evidence.[3]

Under Practice Book § 248 (2), "objection may be made at the trial or hearing to receiving in evidence any deposition or part thereof for any reason which would require the exclusion of the evidence if the witness were then present and testifying."[4] At the trial

[2] The defendant urges us to decline to review this claim of error because the plaintiffs have failed to file a transcript of the proceeding in which the deposition was actually introduced into evidence before the jury. See Practice Book §§ 3018 (a) and 3060F (c) (3). We do have before us a transcript of the proceeding before the trial court in which the rulings were made on the admissibility of the deposition. A copy of the plaintiffs' objections to portions of the deposition had previously been marked as an exhibit for identification. Neither party alleges that these objections or rulings were ever modified. This is not a situation where the parties have failed to isolate an issue or adequately state their objection to a precisely defined ruling. See, e.g., *Aetna Life & Casualty* v. *Miscione of Connecticut, Inc.,* 193 Conn. 435, 437–38, 476 A.2d 577 (1984). While the plaintiffs could and should have completely perfected their appeal by filing a transcript of the proceeding in question, we find the record presented adequate to review the claim of error.

[3] The trial court stated the grounds for its ruling: "The Court overrules the objection on a basis that the question was propounded by the Plaintiffs. The answer was solicited and invited . . . . In view of these circumstances, the Plaintiff cannot place himself in a position of now objecting to answers that he finds unsatisfactory. An exception is noted and placed on the record."

[4] We note that the quoted language of Practice Book § 248 (2) is made expressly subject to the provisions of Practice Book § 248 (3) (c), which retains the common law rules defining those objections that must be raised at the deposition, if at all. The present hearsay objections do not fall within § 248 (3) (c).

the defendant argued, and the trial court agreed, that because the plaintiffs could not have objected to the answers had they elicited them from the witness at trial, they could not object at trial to the answers they elicted at the deposition. This interpretation of Practice Book § 248 (2) misapprehends the function of a discovery deposition in our practice.

Our rules of practice provide guidelines to facilitate the discovery of information relevant to a pending suit. The primary purpose of a deposition taken pursuant to these provisions is discovery. Such depositions must be distinguished from those taken pursuant to General Statutes § 52-156, which codifies the ancient bill in equity to perpetuate testimony. See *Petition of Christensen,* 25 Conn. Sup. 271, 273, 202 A.2d 834 (1964); 1 Stephenson, Conn. Civ. Proc. § 141 (a), pp. 591–92. Evidence may be elicted at a discovery deposition even though "the information sought will be inadmissible at trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence." Practice Book § 218. Thus the allowable scope of inquiry at a discovery deposition clearly exceeds the boundaries of admissible evidence.

Nevertheless, our rules of practice allow the use of discovery depositions as evidence at trial where the deposed witness is unavailable at that time. See Practice Book § 248. Such use is consistent with the rules developed at common law pertaining to previous testimony, which recognize that the need for the evidence coupled with sufficient assurances of reliability, including the availability of cross-examination, may justify the admission of what otherwise would be inadmissible hearsay. "In each case the controlling test is: Can the witness' knowledge be utilized by other means? If not, the use of the former testimony, other conditions in respect to it being met, is justified in the interest of justice by the necessity of the situation." *Atwood* v.

*Atwood,* 86 Conn. 579, 583, 86 A. 29 (1913); see *State* v. *Sharpe,* 195 Conn. 651, 664, 491 A.2d 345 (1985). It would be anomalous, however, to allow the use of discovery depositions at a trial to impinge upon their discovery function, to which their evidentiary use is merely incidental. Yet, this is precisely the result reached by the lower court in subjecting a party seeking to engage in permitted discovery to the risk that at trial he will not be able to object to anything so discovered. Such a rule would create an irrational restriction on the liberal discovery doctrines we have adopted in this jurisdiction and has no support in policy or precedent. See 1 Stephenson, Conn. Civ. Proc. § 141 (g), p. 596.

In fact, the weight of authority is plainly to the contrary. In the venerable case of *Hatch* v. *Brown,* 63 Me. 410, 416 (1874), the court articulated the rule that has been consistently followed. "When a party uses a deposition taken by his opponent, but not offered in evidence by him, he makes it his own, and his opponent has the same right of objection to the interrogatories and answers which he would have had if the deposition had been taken by the party offering it; and he is not precluded by the fact that the interrogatories objected to were propounded by himself when the deposition was taken." Accord *Osborn* v. *Massey-Ferguson, Inc.,* 290 N.W.2d 893, 899 (Iowa 1980); *Baltimore & Ohio R. Co.* v. *Dever,* 112 Md. 296, 310–11, 75 A. 352 (1910); *McLeod* v. *Miller & Lux,* 40 Nev. 447, 153 P. 566 (1917); *Graves* v. *Boston & Maine Railroad,* 84 N.H. 225, 149 A. 70 (1930). In the case before us the deposition was offered by the defendant, the plaintiffs having withdrawn their previous offer thereof with the objectionable testimony deleted. The statements at issue, wherein Sabine related something told to him by a third person, are inadmissible hearsay. See *Acampora* v. *Ledewitz,* 159 Conn. 377, 381, 269 A.2d 288 (1970).

Thus the plaintiffs' objections to the statements should have been sustained when the defendant offered the deposition.

Even this rule, standing alone, is insufficient to protect adequately the rights of a party who seeks to offer a deposition, however. The offering party should be able to introduce the parts of the deposition that he deems admissible and favorable to his case without being compelled to include other portions that are inadmissible and prejudicial. For this reason, Practice Book § 248 (1) allows the use of *"any part or all of a deposition"* by either side. (Emphasis added.) Thus the plaintiffs here should initially have been allowed to introduce only those portions of the deposition of Sabine that they chose to use, regardless of which party elicited the testimony involved. The rights of the defendant would then have been protected by Practice Book § 248 (1) (e), which allows an adverse party to require the offering party to introduce "any other part which ought in fairness to be considered with the part introduced . . . ." The hearsay statements concerning the consumption of alcohol, being inadmissible, do not have this relationship to the portions of the deposition that the plaintiffs sought to introduce, and therefore the trial court should have allowed the plaintiffs to omit those portions in their initial offer. Although the defendant could still have offered the omitted portion during the presentation of its case; see Practice Book § 248 (1) (e); the plaintiffs had the right to object; *Hatch* v. *Brown,* supra; and their objection should have been sustained.

The defendant does not contend on appeal that the trial court did not err in admitting the hearsay statements. It argues that the evidence was wholly cumulative and could not have had any effect on the jury. See *Pisel* v. *Stamford Hospital,* 180 Conn. 314, 327, 430 A.2d 1 (1980). As to the decedent's state of intoxication, the argument has some merit. The undisputed

testimony of the medical examiner establishing the high level of alcohol in the decedent's blood and indicating the amount of alcohol that must be consumed to reach that level would most likely have caused the jury to assume that the decedent had consumed more than the three beers otherwise testified to, making the hearsay statements probably harmless on that issue. There was no such medical testimony, however, as to the decedent's companion Gorski, who was an important witness for the plaintiffs at trial and inferentially one of those referred to in the hearsay statements as having been served beer at the Johnnycake Airport. The hearsay statements, when added to Gorski's own testimony concerning his consumption of three beers previously in the day, may have caused the jury to lend less weight to Gorski's testimony, which depended strongly on his ability to perceive and recollect the events of the day of the accident. Moreover, the statements called into question the credibility of Gorski, who had testified at trial that he had not consumed any alcohol at the airport restaurant. Therefore we cannot agree that the evidence was entirely cumulative, and we conclude that the plaintiffs have sustained their burden of showing the trial court's rulings on the evidence to be "both wrong and harmful." *Saphir* v. *Neustadt,* 177 Conn. 191, 201, 413 A.2d 843 (1979).[5]

---

[5] The defendant claims that the rulings on Sabine's deposition, even if erroneous, would not require a new trial because of the general verdict rule. "Where a jury has rendered a general verdict, on appeal we are unable to determine whether the case against the defendant was resolved on the basis of either the plaintiff's failure to prove the case or the defendant's successful assertion of a special defense. *Cross* v. *Huttenlocher,* 185 Conn. 390, 400, 440 A.2d 952 (1981); *Knight Realty Co.* v. *Caserta,* 126 Conn. 162, 166–69, 10 A.2d 597 (1939). It is presumed, therefore, that the jury found every issue in favor of the defendants." (Citations omitted.) *Stone* v. *Bastarache,* 188 Conn. 201, 204, 449 A.2d 142 (1982). The defendant's claim fails in this case because the evidence of intoxication did not relate solely to the issue of contributory negligence, as it claims, but was admitted for unlimited purposes and was relevant to each ground upon which the defendant's verdict may have rested. The situation differs where an instruction

## II

While the conclusion reached above alone requires us to order a new trial, we shall also consider other issues that are likely to arise on retrial of this matter.[6] See *State* v. *Keiser,* 196 Conn. 122, 131, 491 A.2d 382 (1985); *State* v. *Burge,* 195 Conn. 232, 236, 487 A.2d 532 (1985). First among them is the plaintiffs' claim that the trial court erred in refusing to admit portions of a deposition offered at trial relating to a subsequent design change in the Sentinel MK 2000. The plaintiffs argue that the public policy supporting the exclusion of subsequent remedial measures in negligence cases; see *Rokus* v. *Bridgeport,* 191 Conn. 62, 65, 463 A.2d 252 (1983); does not apply where a strict products liability theory is pursued. We agree.

In *Rokus* v. *Bridgeport,* supra, we recognized that the rule barring evidence of subsequent repairs in negligence actions "is based on narrow public policy grounds, not on an evidentiary infirmity. . . . It presupposes that to admit evidence of subsequent repairs to an identified hazardous condition as proof of negligence penalizes the defendant for taking remedial measures. This discourages alleged tortfeasors from repairing hazards, thereby perpetuating the danger. This policy fosters the public good by allow-

relates to a particular issue or evidence has been admitted for limited purposes or found to be relevant to only some of the issues in a case. See *Blanchard* v. *Bridgeport,* 190 Conn. 798, 803 n.1, 463 A.2d 553 (1983); *Stone* v. *Bastarache,* supra, 205; *LaFleur* v. *Farmington River Power Co.,* 187 Conn. 339, 341–43, 445 A.2d 924 (1982). The evidence here impeached Gorski's testimony, which strongly related to the proximate cause for the accident as well as the defenses raised by the defendant. There are no unaffected grounds upon which we may logically uphold the verdict.

[6] The defendant raises several reasons, some meritorious, why we should decline to review the remaining claims of error. We discuss these claims only because we have found error necessitating a retrial and the remaining issues are best resolved before that proceeding.

ing tortfeasors to repair hazards without fear of having the repair used as proof of negligence . . . . " Id., 67 n.1. As we stated in *Waterbury* v. *Waterbury Traction Co.,* 74 Conn. 152, 168, 50 A. 3 (1901), "a rule which compels one to choose between refraining to do an action which will prevent other accidents, and making evidence against himself by doing such act, is not the one 'best founded in reason, justice and public policy.' "

Even in negligence actions, however, we have held proof of subsequent remedial measures admissible if offered for a purpose other than to show culpable conduct on the part of a defendant. In several cases, we have admitted such evidence when the defendant's control of the hazardous instrumentality is at issue in the suit. See, e.g., *Williams* v. *Milner Hotels Co.,* 130 Conn. 507, 510, 36 A.2d 20 (1944); *Killian* v. *Logan,* 115 Conn. 437, 439, 162 A. 30 (1932). Other courts have established numerous other bases for the admission of the evidence, while retaining the basic rule of exclusion. See McCormick, Evidence (2d Ed.) § 275, pp. 666–69 (1972); Fed. R. Evid., rule 407;[7] see also *Blanchard* v. *Bridgeport,* 190 Conn. 798, 805–806, 463 A.2d 553 (1983). The existence of these exceptions to the general rule illustrates that the strength of the public policy supporting the rule is not so great as to demand the

---

[7] Several courts have transferred the rule of exclusion, exceptions and all, to the field of strict products liability. See generally annot., 74 A.L.R.3d 1001. Most such courts then rely on the feasibility exception to admit the evidence of subsequent remedial measures in practically all strict products liability cases. See, e.g., *Meller* v. *Heil Co.,* 745 F.2d 1297 (10th Cir. 1984); *Grenada Steel Industries* v. *Alabama Oxygen Co.,* 695 F.2d 883, 888–89 (5th Cir. 1983); *Martinez* v. *Atlas Bolt & Screw Co.,* 636 P.2d 1287, 1290 (Colo. App. 1981); *Siruta* v. *Hesston Corporation,* 232 Kan. 654, 667–68, 659 P.2d 799 (1983). While this approach is correct as far as it goes, we believe it makes more sense to address the threshold question of the applicability of the rule excluding evidence of subsequent remedial measures to strict products liability actions and therefore do not reach the question of applicable exceptions in this area.

exclusion where there is a strong probative use for the evidence, as contrasted with the somewhat dubious legal relevance of subsequent repairs to the question of negligence itself.[8]

Strict products liability is based on a policy that assumes that certain losses are better distributed in our society not on the basis of fault, but rather with regard to the ability of the involved parties to absorb them. "The doctrine represents a policy decision that the burden of injuries brought about by a defective product should not be placed upon the individual who uses the product, but, rather, should be borne by the manufacturer or supplier, and thus eventually be spread

---

[8] The concept of legal relevance includes both the threshold requirement of logical relevance plus the added considerations of prejudice, confusion and time consumption that render some logically relevant evidence legally inadmissible. See McCormick, Evidence (2d Ed.) § 185, pp. 440–41; Tait & LaPlante, Handbook of Connecticut Evidence § 8.1 (c), pp. 128–29. While eschewed in *Rokus* v. *Bridgeport,* 191 Conn. 62, 67 n.1, 463 A.2d 252 (1983), an original basis for the exclusion of subsequent repairs evidence in negligence cases was the belief that such evidence was not even logically relevant to the issue of negligence. "The fact that an accident has happened and some person has been injured, immediately puts a party on a higher plane of diligence and duty from which he acts with a view of preventing the possibility of a similar accident, which should operate to commend rather than condemn the person so acting. If the subsequent act is made to reflect back upon the prior one, although it is done upon the theory that it is a mere admission, yet it virtually introduces into the transaction a new element and test of negligence which has no business there, not being in existence at the time." *Nalley* v. *Hartford Carpet Co.,* 51 Conn. 524, 531–32 (1884). This same reasoning underlies the rule of exclusion as it exists in many jurisdictions today. See Fed. R. Evid., rule 407, advisory committee note; *Matsko* v. *Harley Davidson Motor Co.,* 473 Pa. Super. 452, 455, 473 A.2d 155 (1984). In addition, it has been recognized that the evidence may prove confusing and prejudicial in negligence cases. "The introduction of evidence about subsequent changes in the product or its design threatens to confuse the jury by diverting its attention from whether the product was defective at the relevant time to what was done later." *Grenada Steel Industries* v. *Alabama Oxygen Co.,* 695 F.2d 883, 888 (5th Cir. 1983); note, "Subsequently Remedying Strict Products Liability: *Cann* v. *Ford,*" 14 Conn. L. Rev. 759, 766–67 (1982). Thus not much is lost by furthering the policy favoring exclusion in negligence cases.

among the consuming public. Restatement (Second), 2 Torts § 402A, comment c." *Hoelter* v. *Mohawk Service, Inc.,* 170 Conn. 495, 512, 365 A.2d 1064 (1976) (*Bogdanski, J.,* dissenting). Given the strong economic influences on the conduct of a designer or manufacturer created by the existence of the strict liability theory, it is unlikely that any evidentiary use of subsequent remedial measures will discourage a designer or manufacturer from taking them. It is unnecessary therefore to bolster the tendency to take such measures through the use of the exclusionary rule applicable in negligence actions. "When the context is transformed from a typical negligence setting to the modern products liability field . . . the 'public policy' assumptions justifying this evidentiary rule are no longer valid. The contemporary corporate mass producer of goods, the normal products liability defendant, manufactures tens of thousands of units of goods; it is manifestly unrealistic to suggest that such a producer will forego making improvements in its product, and risk innumerable additional lawsuits and the attendant adverse effect upon its public image, simply because evidence of adoption of such improvement may be admitted in an action founded on strict liability for recovery on an injury that preceded the improvement. In the products liability area, the exclusionary rule . . . does not affect the primary conduct of the mass producer of goods, but serves merely as a shield against potential liability." *Ault* v. *International Harvester Co.,* 13 Cal. 3d 113, 120, 528 P.2d 1148, 117 Cal. Rptr. 812 (1974). As the Wisconsin Supreme Court has noted, "[e]conomic realities will set the course and these realities are that the sooner remedial measures are taken, the less costly the defect will be to the manufacturer." *Chart* v. *General Motors Corporation,* 80 Wis. 2d 91, 102, 258 N.W.2d 680 (1977); see also *Caprara* v. *Chrysler Corporation,* 52 N.Y.2d 114, 125, 417 N.E.2d 545, 436 N.Y.S.2d 251 (1981); Davis, "Evidence of Post

Accident Failures, Modifications and Design Changes in Products Liability Litigation," 6 St. Mary's L.J. 792, 798–99 (1975); note, "Evidence of Subsequent Remedial Measures in Products Liability Actions: Recent Conflict in the Circuit Courts," 35 Mercer L. Rev. 1389, 1412–14 (1984); note, "Products Liability and Evidence of Subsequent Repairs," 1972 Duke L.J. 837, 845–52 (1972). Thus we are not convinced that the public policy supporting exclusion of subsequent remedial measures in negligence actions requires the same result in strict liability cases given the other influences created by the strict liability theory which support the taking of such measures.

Given the proclivity toward acknowledging exceptions to the rule of exclusion in negligence cases where the evidence of subsequent remedial measures is highly probative to show something other than the culpable conduct of a product designer or manufacturer, our conclusion that the rule should not extend to actions pursued under a strict liability theory is reinforced by the greater probative value of such measures in strict liability as opposed to negligence cases.[9] "The doctrine of strict liability in tort is concerned with the character of the product injected into the stream of commerce, not with the specific conduct of the defendant." *Giglio* v. *Connecticut Light & Power Co.,* 180 Conn. 230, 234, 429 A.2d 486 (1980). "Subsequent change evidence may be highly probative of defectiveness because it provides a safer alternative against which to compare the allegedly defective product. Because the manufacturer's culpability is not an issue, there should be no concern that the subsequent changes will be construed as an admission of negligence. Therefore, evidence of subsequent changes may be relevant without being prejudicial in strict products liability actions." Note, "Subsequently Remedying Strict Products Liability:

---

[9] See footnote 8, supra.

*Cann* v. *Ford,"* 14 Conn. L. Rev. 759, 769 (1982); see *Lolie* v. *Ohio Brass Co.,* 502 F.2d 741, 744 (7th Cir. 1974); *Caterpillar Tractor Co.* v. *Beck,* 624 P.2d 790, 794 (Alaska 1981); *Sutkowski* v. *Universal Marion Corporation,* 5 Ill. App. 3d 313, 319, 281 N.E.2d 749 (1972).

Thus we conclude that, in cases such as this where a strict products liability theory is pursued, evidence of subsequent design modifications, if shown to be related to the claimed defects,[10] may be admitted at trial.[11]

## III

A third claim of error by the plaintiffs relates to the trial court's failure to grant their motion in limine, which sought to bar the introduction of evidence showing that the decedent's wife had remarried at the time of trial. The plaintiffs argue that such evidence is irrelevant to the legal issues in the case and highly prejudicial. The defendant counters that any prejudice would relate solely to the question of damages, a question that

---

[10] It is unclear from the record whether in this case the evidence of subsequent design change was excluded because of the policy favoring exclusion in negligence cases or because the court felt that the modification, which was intended to correct the problem of the Sentinel MK 2000 activating when a car trunk was slammed shut, was simply too remote from the defect alleged in this case, susceptibility to premature activation of the device in an ascending aircraft. Our discussion indicates no position on the latter question, which must be resolved by the court on retrial.

[11] We note that a negligence claim as well as a strict liability claim was pleaded in this action. While the rule of exclusion still holds in negligence cases, we agree with the Wisconsin Supreme Court that the evidence must be admitted where the two theories are pursued jointly. "We would undermine the efficacy of the plaintiff's ability to allege and prove both strict liability and negligence theories in a products liability case were we to hold that the plaintiff may introduce evidence of post-event remedial measures to prove the allegation of strict liability when presenting only the strict liability theory to the jury but may not introduce such evidence when presenting both negligence and strict liability theories." *D.L. by L.J. Friederichs* v. *Huebner,* 329 N.W.2d 890, 903 (Wis. 1983). In such cases, an instruction limiting the use of the evidence may be appropriate. See *Unterburger* v. *Snow Co.,* 630 F.2d 599, 603 (8th Cir. 1980).

was never reached because the jury found no liability. Because the evidence is completely irrelevant under our law, the motion in limine should have been granted.

"Under our wrongful death statute, 'the statutory right of action belongs, in effect, to the decedent, and to the decedent alone, and damages are recoverable "for the death . . . as for one of the consequences of the wrong inflicted upon the decedent." *Kling* v. *Torello,* [87 Conn. 301], 305, [87 A. 987 (1913)] . . . . "[T]he cause of action . . . [authorized by the statute] is a continuance of that which the decedent could have asserted had [she] lived" and to which death may be added as an element of damage. *Chase* v. *Fitzgerald,* 132 Conn. 461, 467, 45 A.2d 789 [1946]; *Floyd* v. *Fruit Industries, Inc.,* [144 Conn. 659, 668, 136 A.2d 918 (1957)].' *Foran* v. *Carangelo,* 153 Conn. 356, 360, 216 A.2d 638 (1966). See *Waldron* v. *Raccio,* 166 Conn. 608, 616, 353 A.2d 770 (1974)." *Gionfriddo* v. *Avis Rent A Car System, Inc.,* 192 Conn. 280, 291, 472 A.2d 306 (1984). The remarriage of a decedent's spouse has no relationship to the "just damages" recoverable under General Statutes § 52-555 for the injuries suffered by the decedent.[12] Accord *Adams* v. *Davis,* 578 S.W.2d 899, 902 (Ky. App. 1979). Even in states where the damages for death are based on the injury suffered by

---

[12] "In actions for injuries resulting in death, a plaintiff is entitled to 'just damages together with the cost of reasonably necessary medical, hospital and nursing services, and including funeral expenses.' General Statutes § 52-555. 'Just damages' include (1) the value of the decedent's lost earning capacity less deductions for her necessary living expenses and taking into consideration that a present cash payment will be made, (2) compensation for the destruction of her capacity to carry on and enjoy life's activities in a way she would have done had she lived, and (3) compensation for conscious pain and suffering. *Chase* v. *Fitzgerald,* [132 Conn. 461, 470–71, 45 A.2d 789 (1946)]; *Floyd* v. *Fruit Industries, Inc.,* 144 Conn. 659, 669–71, 136 A.2d 918 [1957]; see *Feldman* v. *Allegheny Airlines, Inc.,* 524 F.2d 384 (2d Cir. [1975])." *Katsetos* v. *Nolan,* 170 Conn. 637, 657, 368 A.2d 172 (1976). The subsequent remarriage of a decedent's spouse has no logical connection to these elements of damage suffered by a decedent at the time of death.

the survivors rather than the decedent, the majority rule excludes the admission of evidence relating to remarriage. See generally 1 Speiser, Recovery for Wrongful Death (2d Ed.) § 6:12, pp. 680–83; annots., 88 A.L.R.3d 926, 87 A.L.R.2d 252. The evidence, which may prejudicially impact upon the emotional outlook of the jury, simply has no relevance to the legal issues to be decided and should have been excluded.[13]

## IV

The plaintiffs' last claim of error may be dealt with summarily. The plaintiffs claim on appeal that the trial court should have instructed the jury on the law of excuse relating to statutory violations as per se negligence. See Prosser, Torts (4th Ed. 1921) § 36, p. 198; 2 Restatement (Second), Torts § 288A. The defendant argues not that such an instruction was unwarranted, but rather that no exception to the charge was taken on that account. We will assume that the issue will be properly presented to the trial court on retrial.

There is error, the judgment is set aside and a new trial is ordered.

In this opinion the other judges concurred.

---

[13] We are not in this case faced with the questions of judicial integrity that may be raised when a spouse seeks to testify under an assumed name to avoid the disclosure of remarriage. See, e.g., *Peters* v. *Henshaw,* 640 S.W.2d 197 (Mo. App. 1982). In this case, the spouse kept the name of her first husband after her remarriage.