KEVIN WAGNER ET AL. *v.* CLARK EQUIPMENT
COMPANY, INC., ET AL.
(SC 15553)

Callahan, C. J., and Borden, Norcott, Katz and McDonald, Js.

---

Argued June 4—officially released September 2, 1997

*Wesley W. Horton*, with whom were *Susan M. Cormier, Deborah S. Freeman* and, on the brief, *Kimberly A. Knox, Jeffrey L. Williams* and *Michael Bellafiore*, legal intern, for the appellants (defendants).

*William F. Gallagher*, with whom were *Jacques J. Parenteau* and, on the brief, *Cynthia C. Bott*, for the appellees (named plaintiff et al.).

*Opinion*

BORDEN, J. The principal issue in this appeal is whether two or more intervening forces may combine to create a superseding cause of a plaintiff's injuries, thereby relieving a defendant of liability. The plaintiffs, Kevin and Kim Wagner,[1] brought this product liability action against the defendants, Clark Equipment Company, Inc. (Clark), and Summit Handling Systems, Inc., doing business as Clarklift of Connecticut (Summit), for serious injuries sustained by the plaintiff when his left foot was crushed by a forklift manufactured by Clark and distributed by Summit. The jury returned a verdict for the plaintiff, and the trial court rendered judgment on the verdict. The defendants appeal[2] from that judgment on the grounds that the trial court improperly: (1) failed to instruct the jury that two or more intervening forces may combine to create a superseding cause of the plaintiff's injuries; (2) failed to charge the jury that it could consider Clark's compliance with regulations promulgated by the federal Occupational Safety and Health Administration (OSHA) in

---

[1] The plaintiff Kim Wagner's claim for loss of consortium is derivative of that of her husband, the named plaintiff. Hereafter, unless otherwise indicated, we refer to Kevin Wagner as the plaintiff.

[2] The defendants appealed from the judgment of the trial court to the Appellate Court. We transferred the appeal from the Appellate Court to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c).

determining whether the defendants acted with due care and whether the forklift was defective; and (3) admitted evidence of postaccident modifications made to the forklift by the plaintiff's employer, and improperly charged the jury that such modifications could be considered in determining whether the forklift was defective and whether a safer, alternative design was feasible. The plaintiff argues that if we order a new trial, we should consider whether the trial court improperly failed to submit the issue of punitive damages to the jury. We agree with the defendants that the trial court improperly failed to instruct the jury that two or more intervening forces may combine to create a superseding cause of the plaintiff's injuries. Accordingly, we reverse the judgment of the trial court and order a new trial.

The jury reasonably could have found the following facts. The plaintiff was employed as a carpenter at the Electric Boat Division of General Dynamics Corporation (Electric Boat). On October 25, 1989, the plaintiff was assigned to move a staging tower[3] in bay five of building 260, a large building consisting of several bays in which submarines were being built. On that day, bays three and five of building 260 contained submarines in the process of being assembled. Bay four did not contain a submarine, and was being used as a passageway for pedestrian and vehicular traffic, as well as a storage area for materials being used in assembling the submarines in the other bays.

The moving of a staging tower from one section of a submarine to another section required the efforts of three workers. One worker operated an overhead crane from approximately 100 feet above the floor, a second worker attached cables from the crane to the staging tower, and a third worker directed the crane operator

---

[3] A staging tower is a tall scaffolding tower used by workers to gain access to the submarines being assembled.

from the ground. The plaintiff's job that day was to direct the crane operator from the ground and facilitate communications between the crane operator and the worker at the staging tower. As the plaintiff was standing in the passageway directing the overhead crane operator, a forklift operated by Robert Sarette backed up and struck him from behind. The forklift knocked the plaintiff to the ground and ran over his left foot, causing serious injuries that eventually resulted in the amputation of his lower left leg below the knee.

Several witnesses testified that on the day of the accident building 260 was busy and noisy, and that the passageway was crowded with freight, workers and dumpsters. Two forklifts, one driven by Sarette and the other driven by another Electric Boat worker, were unloading a flatbed trailer in the vicinity of bay five. The passageway was so narrow and cluttered in certain places that only one forklift could pass at a time. Sarette testified that he was turning to the right to allow the other forklift to pass when he backed into the plaintiff.

At the time of the accident, the forklift was equipped with a back-up alarm, two overhead flashing amber lights, rear back-up lights, front and rear directional lights, a rearview mirror and a mirror on the left side of the forklift. The plaintiff was wearing hearing protection, a helmet and safety glasses at the time of the accident. He could hear the forklift's back-up alarm when he was facing it, but the alarm faded into the background noise when he was not. The back-up alarm was sounding right before Sarette struck the plaintiff.

Sarette testified that the forklift had a blind spot to its right rear side. Forklift drivers were trained to look in the direction of travel and to look over their right shoulder when driving straight back in reverse. Sarette, however, was looking over his left shoulder as he was backing up. He did not slow down as he turned to the right and did not look over his right shoulder until the

moment of impact. After the accident, Electric Boat added a flat, sideview mirror to the right side of the forklift cab and a strobe light.

At trial, the plaintiff introduced evidence that Clark had convened a task force in the early 1980s to investigate ways to reduce accidents involving forklifts and pedestrians. Frank Entwhistle, who directed the task force, testified by deposition that one of the task force's objectives had been to investigate the feasibility of a standard system that would alert the forklift operator to the presence of a pedestrian and that would alert a pedestrian to the presence of a forklift. The task force initially recommended a system that consisted of two convex sideview mirrors, a rotating strobe light that automatically adjusted to be brighter than the ambient light, and a back-up alarm that automatically adjusted to be louder than the ambient noise.[4] Entwhistle testified that such a system had not been in existence at that time and that the task force had not pursued the development of the system because they had concluded that it was not feasible as standard equipment on all forklifts. The plaintiff introduced evidence that convex sideview mirrors, self-adjusting back-up alarms and strobe lights were available at that time, although the strobe lights did not rotate. Additional facts will be provided as necessary.

The plaintiff brought this product liability action[5] pursuant to General Statutes § 52-572m[6] on theories of

[4] The task force also investigated the possibility of a device that could sense the presence of a pedestrian and automatically stop the forklift before impact.

[5] The plaintiff's amended complaint consisted of two counts. The first count alleged a violation of the product liability statute, General Statutes § 52-572m; see footnote 6 of this opinion; and the second count alleged a violation of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq. The trial court granted the defendants' motion for summary judgment on the second count. Electric Boat had intervened as a plaintiff in the action, but then withdrew before trial.

[6] General Statutes § 52-572m (b) provides: " 'Product liability claim' includes all claims or actions brought for personal injury, death or property

strict liability for defective design, strict liability for failure to warn or instruct, negligent design, negligent failure to warn or instruct and implied warranty of merchantability.[7] Specifically, the plaintiff alleged that the forklift was defective and unreasonably dangerous because it lacked a standard system consisting of the following: convex mirrors on both the left and right sides of the forklift cab; a strobe light that automatically adjusted to be brighter than the ambient light; and a back-up alarm that automatically adjusted to be louder than the ambient noise.

The jury returned a verdict[8] in favor of the plaintiff in the amount of $3 million, and in favor of Kim Wagner in the amount of $500,000 for loss of consortium. The

damage caused by the manufacture, construction, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging or labeling of any product. 'Product liability claim' shall include, but is not limited to, all actions based on the following theories: Strict liability in tort; negligence; breach of warranty, express or implied; breach of or failure to discharge a duty to warn or instruct, whether negligent or innocent; misrepresentation or nondisclosure, whether negligent or innocent."

[7] The trial court did not submit the theory of implied warranty of merchantability to the jury. This claim is not a part of the appeal.

[8] The following interrogatories were submitted to the jury:

"(1) Was the forklift in a defective condition, unreasonably dangerous to the user when sold by the defendants to Electric Boat?

"(2) Was the defective condition of the forklift a proximate cause of the plaintiff's injuries and damages?

"(3) Were the acts or omissions of Electric Boat the sole proximate cause of the plaintiff's injuries and damages?

"(4) Was the forklift operator, Robert Sarette, negligent in any of the ways alleged which was the sole proximate cause of the plaintiff's injuries and damages?

"(5) Was the plaintiff, Kevin Wagner, negligent in any of the ways alleged in the special defense filed by the defendants?"

The jury answered "yes" to interrogatories one, two and five, and "no" to interrogatories three and four.

The jury was not asked, and did not indicate, whether its verdict was based on negligence, strict liability, or both. Except where indicated herein, the parties have likewise not differentiated their arguments between the two theories. We, therefore, adjudicate the appeal as the parties have presented it to us.

jury found the plaintiff to be 10 percent responsible for his injuries. The defendants filed a motion to set aside the verdict and a motion for judgment notwithstanding the verdict. The trial court denied both motions and rendered judgment on the verdict. This appeal followed.

I

The defendants' principal claim on appeal is that the trial court improperly failed to charge the jury that two or more intervening forces may combine to create a superseding cause of the plaintiff's injuries, thereby relieving the defendants of liability for such injuries. The defendants argue that the jury should have been able to consider whether the alleged negligence of Sarette, Electric Boat and the plaintiff combined so as to be the sole proximate cause of the accident.[9] The plaintiff

[9] The defendants requested the following jury charge: "The [d]efendants contend that the driver of the forklift, Robert Sarette, that the [p]laintiff and that Electric Boat were negligent and that such negligence was the cause of the [p]laintiff's injuries. The [d]efendants additionally contend that Electric Boat failed to maintain a safe work environment in [b]ay 4 of [b]uilding 260 on October 25, 1989. If you were to find a defect in the forklift, and even if you were to find that such defect caused the [p]laintiff's injury, you still must consider whether the acts of the [plaintiff], [Sarette], and/or Electric Boat, intervened and broke the chain of causation between any such product defect and the damages or losses of the [p]laintiff. In order for the [d]efendants to be found liable, the [d]efendants' defective product, this Clark forklift, must be proven to be a substantial factor in causing the [p]laintiff's loss or damage.

"If the negligence of another person or entity broke the chain of causation between the [d]efendants' product and the incident, the [d]efendants are not liable. If an independent force was of such magnitude in producing or bringing about the losses or damages claimed, that it superseded the force and effect of the defective product, then the forklift itself was not a substantial factor in bringing about the damages or losses. This independent superseding force can be the [p]laintiff's conduct or the conduct of a third party, such as [Sarette] or Electric Boat. Additionally, this independent force can arise from the combination of these parties' actions, i.e., the cumulative effect of both [Sarette's] and Electric Boat's conduct. In a circumstance where the independent force supersedes the effect of the forklift, the [defendants] are not liable.

"If the act of another person or a natural force merely concurs, cooperates or contributes, in some degree, in producing the loss or damage such that

responds that in order for two or more intervening forces to constitute a superseding cause, those forces must have acted in concert. We agree with the defendants.

Before turning to the merits of the defendants' claim, we first address two procedural objections raised by the plaintiff regarding the defendants' request to charge. The plaintiff first argues that the requested charge was confusing because it used the "and/or" connector to link the conduct of Sarette, Electric Boat and the plaintiff. Our review of the requested charge in its entirety

its effect is merely concurrent with the [d]efendant's conduct in bringing about the loss or damage sustained, and the [d]efendants' product, if found to be defective, continued to be a substantial factor in bringing about or causing the loss or damage, then the [d]efendants are still liable. If negligence of the forklift driver, [Sarette], and/or [p]laintiff, and/or Electric Boat so entirely superseded the effect of any defective condition of the product that such negligence alone produced the loss or damage, without the defective condition constituting a substantial factor in producing the loss or damage, then the [d]efendants are not liable."

The trial court refused to give the charge requested by the defendants, and, instead gave the following charge, which was requested by the plaintiff:

"The law defines intervening or superseding cause as an act of another party—here, the employer, Electric Boat, or a coworker—which, by its intervention, breaks the chain of causation so as to be the sole or only cause of the injuries. If you determine that their conduct was an intervening cause of the plaintiff's injuries, then the defendants cannot be liable. However, again, the action of the third party must be the sole or only proximate cause of the injuries, nothing less than that.

"For a defendant, whose product created the hazard which was the substantial factor in causing the plaintiff's harm, to be relieved of responsibility by the independent, intervening conduct of a third party, the conduct of a third party must be shown to be the sole, unforeseeable cause of the plaintiff's injuries. If you find that the defendants' actions or products are combined with some other action, then the defendants are still liable.

"Intervening or superseding conduct must be an affirmative, unforeseeable action by some third party which is beyond the foreseeable risk created by the defendants' failure to install devices or instruct regarding pedestrian warning devices.

"A third party's failure to do something does not interfere with or cut off the connection between the defendants' actions that created the risk of harm or directly caused the harm suffered by the plaintiffs unless it is the sole cause of the injury which was not reasonably foreseeable."

reveals that it was clear that the defendants were referring to either the combined conduct of all three entities together, or any combination of their conduct.

The plaintiff next argues that the requested charge did not comply with Practice Book § 318[10] because it did not state the evidence that supported the allegation of how the negligence of Sarette, Electric Boat and the plaintiff combined to cause the injuries. Our review of the requested charge reveals that the defendants alleged that the negligence of Sarette and the plaintiff combined with Electric Boat's failure to maintain a safe workplace to cause the accident. We conclude that the requested charge complied with § 318.

Turning to the merits of the defendants' claim, we begin with an analysis of the relationship between the concepts of proximate cause and superseding cause. "An actual cause that is a substantial factor in the resulting harm is a proximate cause of that harm. E.g., *Ferndale Dairy, Inc.* v. *Geiger,* 167 Conn. 533, 538, 356 A.2d 91 (1975); *Magarian* v. *Bessoni,* [160 Conn. 442, 445, 280 A.2d 357 (1971)]; *Mahoney* v. *Beatman,* 110 Conn. 184, 195, 147 A. 762 (1929). Proximate cause results from a sequence of events unbroken by a superseding cause, so that its causal viability continued until the moment of injury or at least until the advent of the immediate injurious force." *Coburn* v. *Lenox Homes, Inc.,* 186 Conn. 370, 383, 441 A.2d 620 (1982).

"The terms 'intervening cause' and 'superseding cause' have been used interchangeably. See, e.g., *Corey* v. *Phillips,* 126 Conn. 246, 253–56, 10 A.2d 370 (1939). The Restatement of Torts makes clear that the doctrine

---

[10] Practice Book § 318 provides in relevant part: "—Form and Contents of Requests

"When there are several requests, they shall be in separate and numbered paragraphs, each containing a single proposition of law clearly and concisely stated with the citation of authority upon which it is based, and the evidence to which the proposition would apply. . . ."

is properly referred to as 'superseding cause,' and that it embodies within it the concept of an 'intervening force.' 2 Restatement (Second), Torts §§ 440 through 453.

"The function of the doctrine of superseding cause is not to serve as an independent basis of liability, regardless of the conduct of a third party whose negligent conduct may have contributed to the plaintiff's loss. The function of the doctrine is to define the circumstances under which responsibility may be shifted entirely from the shoulders of one person, who is determined to be negligent, to the shoulders of another person, who may also be determined to be negligent, or to some other force. 'A superseding cause is an act of a third person or other force which by its intervention prevents the actor from being liable for harm to another which his antecedent negligence is a substantial factor in bringing about.' Id., § 440.

"If the third person's negligence is determined to be a superseding cause of the plaintiff's injury, that negligence, rather than the negligence of the party attempting to invoke the doctrine of superseding cause, is said to be the sole proximate cause of the injury. *Virelli* v. *Benhattie, Inc.*, 146 Conn. 203, 209, 148 A.2d 760 (1959); see also *Miranti* v. *Brookside Shopping Center, Inc.*, 159 Conn. 24, 29, 266 A.2d 370 (1969); *Corey* v. *Phillips*, [supra, 126 Conn. 254–56]. The doctrine serves as a dividing line between two closely related factual situations: where two forces combine to cause the plaintiff's injuries; and where one force intervenes in such a way as to relieve a negligent defendant from liability. See generally 2 Restatement (Second), Torts §§ 440 through 453. Thus, the doctrine of superseding cause serves as a device by which one admittedly negligent party can, by identifying another's superseding conduct, exonerate himself from liability by shifting the causation element entirely elsewhere.

180

"The circumstances under which this shifting may take place have been well-defined in our case law. Even if a plaintiff's injuries are in fact caused by a defendant's negligence, a superseding cause may break that causal connection if it 'so entirely supersedes the operation of the defendant's negligence that it alone, without his negligence contributing thereto in any degree, produces the injury; or it must be the non-concurring culpable act of a human being who is legally responsible for such act.' *Corey* v. *Phillips*, supra, [126 Conn. 255]. ' "If a defendant's negligence was a substantial factor in producing the plaintiff's injuries, the defendant would not be relieved from liability for those injuries even though another force concurred to produce them." *Miranti* v. *Brookside Shopping Center, Inc.*, supra, [159 Conn. 29]. . . .' " (Citation omitted.) *D'Arcy* v. *Shugrue*, 5 Conn. App. 12, 24–25, 496 A.2d 967, cert. denied, 197 Conn. 817, 500 A.2d 1336 (1985). "Whether a superseding cause was of such a character as to prevent an act of negligence of the defendant from being a substantial factor in producing a plaintiff's injury is ordinarily a question of fact. *Corey* v. *Phillips*, [supra, 254]; *Roden* v. *Connecticut Co.*, 113 Conn. 408, 413, 155 Atl. 721 [1931]." *Colligan* v. *Reilly*, 129 Conn. 26, 30, 26 A.2d 231 (1942).

The issue of whether two or more forces may combine to create a superseding cause is one of first impression for this court. Although the Appellate Court has recognized that two or more acts may constitute a superseding cause, it has done so only in cases in which the two intervening actors were acting in concert. See, e.g., *Amendola* v. *Geremia*, 21 Conn. App. 35, 38, 571 A.2d 131, cert. denied, 215 Conn. 803, 574 A.2d 217 (1990) (jury question whether conduct of two boys who put bleach in spray bottle constituted superseding cause of plaintiff's injuries); *Burns* v. *Gleason Plant Security, Inc.*, 10 Conn. App. 480, 482–83, 523 A.2d 940 (1987)

(conduct of two robbers was superseding cause of plaintiff's injuries). The fact that the alleged intervening acts were committed in concert, however, was not critical to the court's analysis in those cases. The court properly focused on the *nature* of the acts, and whether they were sufficient to break the causal connection between the defendant's conduct and the plaintiff's injuries. *Amendola* v. *Geremia,* supra, 38; *Burns* v. *Gleason Plant Security, Inc.,* supra, 483.

Turning to other jurisdictions for guidance, we are persuaded by the reasoning of the First Circuit Court of Appeals in *Allen* v. *Chance Mfg. Co.,* 873 F.2d 465 (1st Cir. 1989), that two or more forces not acting in concert may combine to create a superseding cause. In *Allen,* an amusement park worker was in the process of disassembling a ride when the metal pin he was hammering shattered. The worker was not wearing safety glasses and sustained serious injuries when fragments of the metal pin flew into his eyes. He brought a product liability action against the manufacturer of the metal pin on the basis of negligent design, negligent manufacture and failure to instruct on the need for safety glasses.[11] Id.

At trial, the defendant requested the following jury charge: "If you find that the conduct of someone other than [the defendant] was the sole proximate cause of the plaintiff's accident, then you must return a verdict for [the defendant]. This conduct may be the negligence of [the plaintiff's employer] and/or negligence of the plaintiff." Id., 467. The defendant argued that the negligence of the employer in failing to require that its workers wear safety glasses, and the negligence of the plaintiff in failing to wear safety glasses and in rushing to complete his job were the sole proximate cause of

[11] The plaintiff was prohibited by the Massachusetts Workers' Compensation Act from bringing a cause of action against his employer.

the plaintiff's injuries. Id., 466. The trial court refused to give the jury the requested instruction, and the jury returned a verdict for the plaintiff. Id., 466–67.

Applying Massachusetts law, the First Circuit Court of Appeals reversed the trial court and held that its failure to instruct as requested was improper. Id., 469. The court reasoned that "a defendant is relieved from all liability if it can show that the injury was legally caused in its entirety by other persons or entities— that is, that the sole proximate cause of the injury was elsewhere, and not in the defendant." Id., 467; accord *Leistra* v. *Bucyrus-Erie Co.*, 443 F.2d 157, 163 (8th Cir. 1971) (acts of plaintiff in prying cable with crow bar and crane operator in swinging drum superseded liability of manufacturer); *Obray* v. *Glick*, 104 Idaho 432, 434, 660 P.2d 44 (1982) (acts of plaintiff in stepping into traffic and motorist in not paying attention superseded conduct of police officer); *LaChance* v. *Ross Machine & Mill Supply, Inc.*, 102 Idaho 505, 507, 633 P.2d 570 (1981) (acts of employer in altering machine by adding grate, coworker in removing grate, and plaintiff in inserting screwdriver into machine superseded liability of manufacturer); *Cook* v. *Caterpillar, Inc.*, 849 S.W.2d 434, 440 (Tex. App. 1993) (act of plaintiff's decedent in passing road grader, or act of driver of grader, or both, superseded liability of manufacturer).

We agree with the court in *Allen* that the inquiry should properly focus on the nature of the intervening forces, and whether they were sufficient to shift the entire causation element to some entity or entities other than the defendant. It should not matter whether the intervening force is one act or a combination of acts, so long as it entirely breaks the causal connection between the defendant's conduct and the plaintiff's injuries so as to be the sole proximate cause of those injuries. We conclude, therefore, that two or more

intervening forces may combine to create a superseding cause of a plaintiff's injuries.

The plaintiff argues that the defendants should not be allowed to stack separate concurring or contributing causes to reach 100 percent of the cause of the plaintiff's injuries, and then deem this accumulation to be the sole cause of the injuries. This argument, however, confuses the concepts of concurring cause and superseding cause. A concurrent cause is contemporaneous and coexistent with the defendant's wrongful conduct and actively cooperates with the defendant's conduct to bring about the injury. See, e.g., *Neal* v. *Shiels, Inc.*, 166 Conn. 3, 18, 347 A.2d 102 (1974); *Figlar* v. *Gordon*, 133 Conn. 577, 582–83, 53 A.2d 645 (1947); *Corey* v. *Phillips*, supra, 126 Conn. 254; *Cuneo* v. *Connecticut Co.*, 124 Conn. 647, 652, 2 A.2d 220 (1938). A concurrent cause does not relieve the defendant of liability. *Corey* v. *Phillips*, supra, 254. A superseding cause, by contrast, "so entirely supersedes the operation of the defendant's negligence that it alone, without his negligence contributing thereto in any degree, produces the injury; or it must be the non-concurring culpable act of a human being who is legally responsible for such act." Id., 255. Our conclusion leaves to the jury the determination of whether the intervening acts concurred *with the defendants' conduct*, in which case the defendants would not be relieved of liability, or whether they combined *with each other* so as to create a superseding cause that broke the causal connection between the defendants' conduct and the injuries, in which case the defendants would be relieved of liability.[12]

The plaintiff next argues that including his conduct in any superseding cause charge would contravene General Statutes § 52-572o,[13] which sets forth a "pure" comparative responsibility standard for a product liability

---

[12] The defendants' request to charge properly distinguished between concurring cause and superseding cause. See footnote 9 of this opinion.

[13] General Statutes § 52-572o provides in relevant part: "Comparative responsibility. Award of damages. Action for contribution. (a) In any claim

action. Under a pure comparative responsibility standard, a plaintiff's negligence does not entirely bar his recovery, but merely results in a proportionate reduction of damages. See General Statutes § 52-572o. Comparative responsibility does not come into play, however, unless the defendant is found to have proximately caused the plaintiff's injuries. It is a means of apportioning damages, once causation has been determined. Superseding cause, on the other hand, serves to exonerate the defendant of all liability. We conclude that it is for the jury to determine whether the plaintiff's conduct, if negligent, combined with the conduct of Sarette and Electric Boat so as to constitute a superseding cause, in which case the defendants are not liable, or whether the plaintiff's conduct concurred with the conduct of the defendants, in which case the plaintiff's recovery would be merely reduced pursuant to § 52-572o.

With these principles in mind, we turn to the trial court's instruction with respect to superseding cause.

under sections 52-240a, 52-240b, 52-572m to 52-572q, inclusive, or 52-577a, the comparative responsibility of, or attributed to, the claimant, shall not bar recovery but shall diminish the award of compensatory damages proportionately, according to the measure of responsibility attributed to the claimant.

"(b) In any claim involving comparative responsibility, the court may instruct the jury to give answers to special interrogatories, or if there is no jury, the court may make its own findings, indicating (1) the amount of damages each claimant would receive if comparative responsibility were disregarded, and (2) the percentage of responsibility allocated to each party, including the claimant, as compared with the combined responsibility of all parties to the action. For this purpose, the court may decide that it is appropriate to treat two or more persons as a single party.

"(c) In determining the percentage of responsibility, the trier of fact shall consider, on a comparative basis, both the nature and quality of the conduct of the party.

"(d) The court shall determine the award for each claimant according to these findings and shall enter judgment against parties liable on the basis of the common law joint and several liability of joint tortfeasors. The judgment shall also specify the proportionate amount of damages allocated against each party liable, according to the percentage of responsibility established for such party. . . ."

" 'In assessing the adequacy of a charge to the jury, we consider the charge in its entirety, and judge it by its total effect rather than by its individual component parts. . . . We consider whether the instructions are sufficiently correct in law, adapted to the issues and ample for the guidance of the jury. . . . The charge must give the jurors a clear comprehension of the issues presented for their determination under the pleadings and upon the evidence, and must be suited to guide them in the determination of those issues. . . . The test is whether the charge as a whole fairly presented the case to the jury so that no injustice was done under established rules of law.' " (Citations omitted.) *Potter* v. *Chicago Pneumatic Tool Co.*, 241 Conn. 199, 238–40, 694 A.2d 1319 (1997).

In the present case, the defendants claimed to have proved that the acts of Sarette in failing to look over his right shoulder, Electric Boat in maintaining an allegedly unsafe workplace, and the plaintiff in failing to pay attention to his surroundings combined so as to entirely supersede the lack of additional safety devices on the forklift as the proximate cause of the accident. The jury reasonably could have found that these acts combined to create a superseding cause of the accident, or that these acts merely concurred with, and contributed to, the lack of appropriate safety devices in causing the accident. That determination was a question of fact for the jury.[14] "It was therefore the court's duty to adequately explain to the jury the nature of superseding

[14] The plaintiff raises for the first time on appeal that, under the circumstances of this case, a charge on superseding cause "may have been unnecessary." The plaintiff argues that the acts of Sarette, Electric Boat and himself were foreseeable as a matter of law, and therefore, by definition, were not a superseding cause. Specifically, the plaintiff argues that these acts were foreseeable because Clark convened a task force in the 1980s to investigate the feasibility of a standardized warning system that would reduce collisions between forklifts and pedestrians. The plaintiff also points to evidence that the task force investigated past accidents involving forklifts and pedestrians and was aware that forklifts would operate in busy, noisy industrial settings.

cause as related to the circumstances of this case by directions sufficient to bring them to a legal conclusion." *Corey* v. *Phillips*, supra, 126 Conn. 254. We conclude that the defendants were entitled to have the jury charged in accordance with their request, and that, because causation was a critical issue in this case, the failure to charge substantially in accordance with the defendants' proper request constituted harmful error. The trial court, therefore, improperly denied the defendants' motion to set aside the verdict. See *Guglielmo* v. *Klausner Supply Co.*, 158 Conn. 308, 314, 259 A.2d 608 (1969). Accordingly, we reverse the judgment of the trial court and order a new trial.

## II

The defendants next claim[15] that the trial court improperly failed to instruct the jury that it could consider evidence that the forklift was in compliance with applicable OSHA regulations in determining whether the forklift was defectively designed and whether the defendants acted with due care in their design and distribution of the forklift. The defendants argue that the OSHA regulation was properly admitted into evidence on the plaintiff's theories of strict liability and

In effect, the plaintiff therefore argues that no superseding cause instruction was warranted in the first place. This argument is contrary to the position taken by the plaintiff at trial, in which he submitted the exact superseding cause charge that the trial court gave to the jury. That charge allowed the jury to consider whether the individual conduct of Sarette, Electric Boat or the plaintiff could separately constitute a superseding cause of the accident. See footnote 9 of this opinion. At trial the plaintiff never objected to this charge given by the trial court. The plaintiff cannot now complain that the charge should never have been given, when the charge given was exactly the one he requested. We ordinarily review claims as they were presented and argued in the trial court; see Practice Book § 4061; and see no reason to depart from that practice in this appeal. See *Aksomitas* v. *Aksomitas*, 205 Conn. 93, 97, 529 A.2d 1314 (1987) (declining to review issue of jury charge where party failed to object to charge at trial). We therefore decline to consider this claim, which the plaintiff is free to raise on retrial.

[15] Although our conclusion requires a new trial, we consider the parties' remaining claims to the extent that they are likely to arise on retrial.

negligence, and therefore, that the trial court should have given the requested charge. We agree.

The following additional facts are relevant to this issue. At trial, the defendants introduced an OSHA regulation governing safety requirements for industrial forklifts. See 29 C.F.R. § 1910.178 (a) (2) (1992).[16] The only warning device required by this regulation was an operator-controlled horn. The defendants alleged that the forklift at issue met and exceeded this requirement because it was equipped not only with a horn, but also with a back-up alarm, flashing amber lights, rear back-up lights, a rearview mirror and a left sideview mirror. The defendants filed a request to charge the jury that it could consider the forklift's compliance with this OSHA regulation as a factor in determining whether the forklift was defectively designed and whether the defendants acted with due care in their design and distribution of the forklift.[17] The trial court refused to submit the defendant's charge concerning the OSHA regulation to the jury, and the defendants excepted.

A request to charge which is relevant to the issues of the case and which is an accurate statement of the law must be given. *State* v. *Whelan*, 200 Conn. 743, 748,

---

[16] The plaintiff argues that this regulation was never admitted into evidence. The defendants introduced into evidence an industry standard drafted by the American Society of Mechanical Engineers and approved by the American National Standards Institute, Inc., entitled "Safety Standard for Low Lift and High Lift Trucks" (ASME/ANSI B56.1). This standard requires that every forklift be equipped with an operator-controlled horn. Several experts testified that ASME/ANSI B56.1 was incorporated by reference into 29 C.F.R. § 1910.178 (a) (2) (1992). We conclude that this evidence was sufficient to present the issue of compliance with the OSHA regulation to the jury.

[17] The defendants requested the following charge: "The [d]efendants have offered evidence of their compliance with applicable [OSHA] regulations in their design and distribution of the forklift. The [d]efendants' compliance with such OSHA regulations is a factor for you to consider in determining both (i) whether the forklift was a reasonably safe product, and (ii) whether the [d]efendants acted with due care."

513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986); *State* v. *Gabriel*, 192 Conn. 405, 418, 473 A.2d 300 (1984); *Mazzucco* v. *Krall Coal & Oil Co.*, 172 Conn. 355, 357, 374 A.2d 1047 (1977). The plaintiff argues that evidence of compliance with OSHA regulations is irrelevant in a product liability action against a manufacturer. In support of this argument, the plaintiff relies principally on a decision by the Sixth Circuit Court of Appeals in *Minichello* v. *U.S. Industries, Inc.*, 756 F.2d 26, 29 (6th Cir. 1985), in which the court prohibited the use of evidence of compliance with OSHA regulations in a product liability action on the grounds that: (1) OSHA is not intended to affect the civil standard of liability; see 29 U.S.C. § 653 (b) (4);[18] and (2) OSHA pertains to the conduct of the employer, not the manufacturer. We do not agree.

We have previously rejected the first ground relied upon by the court in *Minichello* as a reason for prohibiting the use of OSHA regulations as evidence in a civil action. In *Wendland* v. *Ridgefield Construction Services, Inc.*, 184 Conn. 173, 181, 439 A.2d 954 (1981), we held that OSHA regulations, if applicable, may be used as evidence of the standard of care in a negligence action against an employer. See also *Mingachos* v. *CBS, Inc.*, 196 Conn. 91, 110, 491 A.2d 368 (1985). "Where an OSHA regulation applies in a civil case, it can provide helpful guidance to the jury in its deliberations." *Wendland* v. *Ridgefield Construction Services, Inc.*, supra, 181.

Turning to the second ground relied upon by the court in *Minichello*, we have yet to consider whether

---

[18] Title 29 of the United States Code § 653 (b) (4), provides: "Nothing in this chapter shall be construed to supersede or in any manner affect any workmen's compensation law or to enlarge or diminish or affect in any other manner the common law or statutory rights, duties or liabilities of employers and employees under any law with respect to injuries, diseases, or death of employees arising out of, or in the course of, employment."

evidence of compliance with OSHA regulations is relevant in a product liability action against a manufacturer. The defendants argue that where the regulation at issue addresses the safety of a product, it is relevant to the issue of defective design in a product liability action. We agree with the defendants.

In *Potter* v. *Chicago Pneumatic Tool Co.*, supra, 241 Conn. 199, we recently discussed the standard to be used in a product liability action for determining whether a product is defectively designed. "This court has long held that in order to prevail in a design defect claim, '[t]he plaintiff must prove that the product is unreasonably dangerous.' [*Giglio* v. *Connecticut Light & Power Co.*, 180 Conn. 230, 234, 429 A.2d 486 (1980)]. We have derived our definition of 'unreasonably dangerous' from comment (i) to [2 Restatement (Second), Torts, § 402A], which provides that 'the article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.' 2 Restatement (Second), supra, § 402A, comment (i). This 'consumer expectation' standard is now well established in Connecticut strict products liability decisions." *Potter* v. *Chicago Pneumatic Tool Co.*, supra, 214–15.[19]

---

[19] In *Potter* v. *Chicago Pneumatic Tool Co.*, supra, 241 Conn. 220, we adopted a modified formulation of the consumer expectation test for determining whether a product meets consumer expectations regarding its safety. Under the modified consumer expectation test, a "consumer's expectations may be viewed in light of various factors that balance the utility of the product's design with the magnitude of its risks." Id. These factors include, but are not limited to, the "usefulness of the product, the likelihood and severity of the danger posed by the design, the feasibility of an alternative design, the financial cost of an improved design, the ability to reduce the product danger without impairing its usefulness or making it too expensive, and the feasibility of spreading the loss by increasing the product's price." Id., 221. We held that "it is the function of the trial court to determine whether an instruction based on the ordinary consumer expectation test, or the modified consumer expectation test, or both, is appropriate in light of the evidence presented." Id., 223.

Evidence that a product complies with an OSHA regulation that addresses the safety of the product may be probative of whether the product meets consumer expectations regarding its safety. As one court has explained, "[t]he evidence that we approve is that the [product], not the manufacturer's conduct, conforms to federal OSHA standards." *Deyoe* v. *Clark Equipment Co.*, 134 Ariz. 281, 285, 655 P.2d 1333 (App. 1982); accord *Gideon* v. *Johns-Manville Sales Corp.*, 761 F.2d 1129, 1144 (5th Cir. 1985) (compliance with OSHA standards "constitutes strong and substantial evidence that a product is not defective"); *Turney* v. *Ford Motor Co.*, 94 Ill. App. 3d 678, 685–86, 418 N.E.2d 1079 (1981). Furthermore, where the OSHA regulation at issue addresses the safety of the product, there is little concern that evidence of compliance with the regulation would improperly shift the jury's focus away from the safety of the product to the conduct of the employer. We conclude that, where the OSHA regulation at issue relates to the safety of a product, evidence that the product is in compliance with that regulation may be considered by the jury as a factor in determining whether the product is defectively designed and whether the manufacturer exercised due care in designing the product.

In the present case, the plaintiff alleged that the forklift was unreasonably dangerous because it lacked a standardized warning system sufficient to gain the attention of drivers and pedestrians when used in an industrial setting. This alleged design defect was the basis for the plaintiff's negligence and strict liability claims. The defendants introduced evidence that the forklift complied with, and exceeded, the standard contained in the OSHA regulation that addressed safety requirements for industrial forklifts. The permissible inference to be drawn from this evidence is that a product that meets the minimum safety requirements contained in the OSHA regulation is not defective. It is also

permissible to infer that if the OSHA regulation requires a forklift to have certain safety devices, a manufacturer would be prudent in designing a forklift that meets that requirement. Therefore, evidence that the forklift was in compliance with the OSHA regulation that addressed the safety of forklifts was relevant to the issues of whether the forklift was defectively designed and whether the defendants acted with due care in their design and distribution of the forklift.

The plaintiff argues that a charge regarding compliance with OSHA would have been cumulative, because the trial court had already charged the jury that it could consider evidence that the forklift complied with the relevant industry standard, ASME/ANSI B56.1. The plaintiff asserts that giving the OSHA charge in addition to the charge regarding the ASME/ANSI B56.1 standard would have served to emphasize this issue unduly. We agree with the defendants, however, that compliance with a federal regulation may carry more weight with a jury than compliance with an industry standard, because a federal regulation has the imprimatur of the federal government. We, therefore, reject the plaintiff's argument that a charge regarding compliance with OSHA would have been merely cumulative of the charge regarding compliance with the ASME/ANSI B56.1 standard.

We conclude that the defendants' request to charge regarding compliance with the OSHA regulation was relevant to the issues and was an accurate statement of the law. Accordingly, the defendants were entitled to have the jury so charged.

III

The defendants next claim that the trial court improperly admitted evidence of postaccident modifications made to the forklift by Electric Boat. In support of this

claim, the defendants argue that postaccident modifications made by a nonparty are irrelevant to the issue of whether the forklift was defectively designed and whether a safer, alternative design was feasible. We are unpersuaded.

The following additional facts are relevant to this claim. Following the accident, Electric Boat launched an investigation into ways in which to prevent similar accidents from happening in the future. Thomas O'Brien, chief of the transportation department at Electric Boat, and Rodney Allen, chief of the safety and industrial hygiene department at Electric Boat, testified that, in response to the plaintiff's accident, their departments investigated the feasibility of placing additional safety devices on the forklift to prevent future accidents between forklifts and pedestrians. O'Brien testified that he recommended the use of strobe lights and conducted initial testing of such lights on a few of the forklifts. Based on the response of workers to these strobe lights, he determined that the lights were effective and had them installed on all of the forklifts at Electric Boat. Although Allen was initially skeptical about the effectiveness of strobe lights, he supported the decision to put them on all of the forklifts after receiving positive feedback from the initial testing. O'Brien also testified that a flat, right sideview mirror had been placed on the forklift that injured the plaintiff to eliminate the blind spot on the right rear side.[20] The defendants filed a motion in limine to exclude all evidence of these subsequent remedial measures taken by Electric Boat, but the trial court denied the motion.

We turn first to the defendants' argument that the postaccident modifications made by Electric Boat are

[20] Although the evidence introduced at trial does not indicate exactly when these modifications were made, it is reasonable to infer that they were made no later than 1991. Photographs taken in 1991 of the forklift at issue were introduced into evidence and showed that a strobe light and a right sideview mirror were already in place on the forklift.

irrelevant to the issue of the forklift's safety. Under Connecticut law, although evidence of subsequent remedial measures is generally not admissible in a negligence action on the issue of whether the defendant failed to exercise due care, it is admissible in a strict liability action on the issue of whether the product was defectively designed if the remedial repairs are related to the alleged design defect. *Sanderson* v. *Steve Snyder Enterprises, Inc.*, 196 Conn. 134, 148, 491 A.2d 389 (1985). In *Sanderson*, we explained the rationale for excluding such evidence in negligence actions, while allowing it in strict liability actions. "[T]he rule barring evidence of subsequent repairs in negligence actions is based on narrow public policy grounds, not on an evidentiary infirmity. . . . It presupposes that to admit evidence of subsequent repairs to an identified hazardous condition as proof of negligence penalizes the defendant for taking remedial measures. This discourages alleged tortfeasors from repairing hazards, thereby perpetuating the danger. This policy fosters the public good by allowing tortfeasors to repair hazards without fear of having the repair used as proof of negligence . . . .

"Even in negligence actions, however, we have held proof of subsequent remedial measures admissible if offered for a purpose other than to show culpable conduct on the part of a defendant. In several cases, we have admitted such evidence when the defendant's control of the hazardous instrumentality is at issue in the [action]. See, e.g., *Williams* v. *Milner Hotels Co.*, 130 Conn. 507, 510, 36 A.2d 20 (1944); *Killian* v. *Logan*, 115 Conn. 437, 439, 162 A. 30 (1932). Other courts have established numerous other bases for the admission of the evidence, while retaining the basic rule of exclusion. See [C. McCormick, Evidence (2d Ed. 1972) § 275, pp. 666–69; Fed. R. Evid. 407]; see also *Blanchard* v. *Bridgeport*, 190 Conn. 798, 805–806, 463 A.2d 553 (1983). The

existence of these exceptions to the general rule illustrates that the strength of the public policy supporting the rule is not so great as to demand the exclusion where there is a strong probative use for the evidence, as contrasted with the somewhat dubious legal relevance of subsequent repairs to the question of negligence itself.

"Strict products liability is based on a policy that assumes that certain losses are better distributed in our society not on the basis of fault, but rather with regard to the ability of the involved parties to absorb them. The doctrine represents a policy decision that the burden of injuries brought about by a defective product should not be placed upon the individual who uses the product, but, rather, should be borne by the manufacturer or supplier, and thus eventually be spread among the consuming public. [2 Restatement (Second), Torts § 402A, comment (c)]. *Hoelter* v. *Mohawk Service, Inc.*, 170 Conn. 495, 512, 365 A.2d 1064 (1976) (*Bogdanski, J.*, dissenting). Given the strong economic influences on the conduct of a designer or manufacturer created by the existence of the strict liability theory, it is unlikely that any evidentiary use of subsequent remedial measures will discourage a designer or manufacturer from taking them. It is unnecessary therefore to bolster the tendency to take such measures through the use of the exclusionary rule applicable in negligence actions. When the context is transformed from a typical negligence setting to the modern products liability field . . . the public policy assumptions justifying this evidentiary rule are no longer valid. . . . Thus we are not convinced that the public policy supporting exclusion of subsequent remedial measures in negligence actions requires the same result in strict liability cases given the other influences created by the strict liability theory which support the taking of such measures.

"[O]ur conclusion that the rule should not extend to actions pursued under a strict liability theory is reinforced by the greater probative value of such measures in strict liability as opposed to negligence cases. The doctrine of strict liability in tort is concerned with the character of the product injected into the stream of commerce, not with the specific conduct of the defendant. *Giglio* v. *Connecticut Light & Power Co.*, [supra, 180 Conn. 234]. Subsequent change evidence may be highly probative of defectiveness because it provides a safer alternative against which to compare the allegedly defective product. Because the manufacturer's culpability is not an issue, there should be no concern that the subsequent changes will be construed as an admission of negligence. Therefore, evidence of subsequent changes may be relevant without being prejudicial in strict products liability actions. Note, 'Subsequently Remedying Strict Products Liability: *Cann* v. *Ford*,' 14 Conn. L. Rev. 759, 769 (1982) . . . ." (Citations omitted; internal quotation marks omitted.) *Sanderson* v. *Steve Snyder Enterprises, Inc.*, supra, 196 Conn. 143–48.

Although the defendants concede that evidence of subsequent remedial measures is generally admissible in a strict liability action, they argue that it is not relevant when the remedial measures are undertaken by a nonparty, such as the plaintiff's employer in the present case. "Evidence is admissible when it tends to establish a fact in issue or to corroborate other direct evidence in the case. One fact is relevant to another fact whenever, according to the common course of events, the existence of the one, taken alone or in connection with other facts, renders the existence of the other either certain or more probable. Unless excluded by some rule or principle of law, any fact may be proved which logically tends to aid the trier in the determination of the issue." (Internal quotation marks omitted.) *State* v. *McClendon*, 199 Conn. 5, 8–9, 505 A.2d 685 (1986).

" 'Evidence is not rendered inadmissible because it is not conclusive. All that is required is that evidence *tend* to support a relevant fact even to a slight degree, so long as it is not prejudicial or merely cumulative.' C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 8.1.1, p. 226." (Emphasis in original.) *State* v. *Porter*, 241 Conn. 57, 87–88, 698 A.2d 739 (1997). On appeal, a trial court's ruling as to the admissibility of evidence is accorded great deference; *State* v. *Boucino*, 199 Conn. 207, 225, 506 A.2d 125 (1986); and we will reverse such a ruling only upon a showing of a clear abuse of discretion. *Farrell* v. *St. Vincent's Hospital*, 203 Conn. 554, 556, 525 A.2d 954 (1987).

In the present case, the plaintiff introduced evidence that, in response to the accident, Electric Boat added a right sideview mirror and a strobe light to the forklift. The plaintiff also introduced evidence that these devices were available at the time the forklift was manufactured. This evidence was probative of the existence of a defect at the time of the accident and permitted an inference that the forklift was defective before Electric Boat made the modifications. Furthermore, the policy reasons for excluding evidence of subsequent remedial measures in a negligence action against a manufacturer do not apply in a strict liability action in which liability is not asserted against the person who made the alterations. *Hartmann* v. *Black & Decker Mfg. Co.*, 16 Conn. App. 1, 15, 547 A.2d 38 (1988). The fact that someone other than the manufacturer undertook postaccident remedial measures cannot reasonably be inferred as an admission of negligence on the part of the manufacturer. Id., 14 n.10; accord *Ford Motor Co.* v. *Nuckolls*, 320 Ark. 15, 21–22, 894 S.W.2d 897 (1995); *Magnante* v. *Pettibone-Wood Mfg. Co.*, 183 Cal. App. 3d 764, 768, 228 Cal. Rptr. 420 (1986); *Blaw-Knox Construction Equipment Co.* v. *Morris*, 88 Md. App. 655, 660–61, 596

A.2d 679 (1991); *McFarland* v. *Bruno Machinery Corp.*, 68 Ohio St. 3d 305, 312, 626 N.E.2d 659 (1994).

The defendants nonetheless argue that the prejudicial impact of evidence of subsequent remedial measures outweighs any probative value because an employer may make repairs for reasons completely independent of the product's safety. See, e.g., *Leaphart* v. *Whiting Corp.*, 387 Pa. Super. 253, 268–69, 564 A.2d 165 (1989), appeal denied, 525 Pa. 619, 577 A.2d 890 (1990) (subsequent remedial repairs by employer irrelevant because repairs may be made for reasons unrelated to defectiveness, such as pressure from union or desire to conduct business more efficiently). Even if we were to agree with the defendants' argument as a general matter, there was no evidence that the modifications made by Electric Boat were undertaken for reasons unrelated to safety concerns. In fact, the evidence showed that Electric Boat's motivation in adding the strobe light and the mirror was to prevent similar accidents from happening in the future.[21] We conclude, therefore, that

[21] In his concurring and dissenting opinion, Chief Justice Callahan echoes the defendants' argument that evidence of subsequent remedial measures is, at best, ambiguous on the issue of whether the forklift was unreasonably dangerous because the employer may have made the modifications because of pressure from a union or to appease concerned workers in the wake of a terrible tragedy. There was no evidence in the present case to suggest such extraneous forces and, as indicated previously, there was evidence showing that the motivation for the modifications was for additional safety purposes.

Chief Justice Callahan also argues that the prejudicial effect of Electric Boat's modifications outweighs any probative value because the jury may be confused by having its attention diverted from whether the product was defective at the time of manufacture to what was done later. In support of this argument, he relies on *Grenada Steel Industries* v. *Alabama Oxygen Co.*, 695 F.2d 883 (5th Cir. 1983). In that case, the plaintiff sought to introduce evidence that five years after the allegedly defective valve was manufactured, a competitor of the defendant designed and manufactured a valve based on an alternative design. The court acknowledged that "[a]lternative designs may indicate that the product was unreasonably dangerous . . . but only if they were available at the time of manufacture." Id., 889. The court excluded the evidence of the competitor's design, because it determined

the trial court did not abuse its discretion in admitting evidence of Electric Boat's postaccident modifications on the issue of whether the forklift was defectively designed.

We turn next to the defendants' argument that the evidence of postaccident modifications made by Electric Boat was improperly admitted on the issue of the feasibility of a safer, alternative design. The defendants assert that the modifications made by Electric Boat to the forklift are irrelevant to the issue of feasibility. We disagree.

In *Potter* v. *Chicago Pneumatic Tool Co.*, supra, 241 Conn. 220–21, we held that the jury may consider the feasibility of a safer, alternative design in weighing a product's risks against its utility to determine whether a reasonable consumer would consider the product design unreasonably dangerous. In the present case, the defendants argue that the modifications made by Electric Boat are irrelevant to the issue of feasibility because Electric Boat added only a strobe light and a flat sideview mirror, not the standardized system proposed by the plaintiff of a self-adjusting strobe light, self-adjusting back-up alarm and two convex sideview mirrors. The defendants further assert that the fact that one employer made changes to one forklift is irrelevant to whether it was feasible for the manufacturer to produce a standardized system on all forklifts. We conclude

that the prejudicial impact of the evidence outweighed the probative value. As the court explained: "We fail to see how an alternative design, developed by another person years after the product in question was manufactured, is relevant to whether the product was reasonably safe at the time it was made." Id. In the present case, the plaintiff introduced evidence that strobe lights and right sideview mirrors were available when the forklift was manufactured in the spring of 1989. Further, the plaintiff introduced evidence that the addition of a strobe light and right-hand mirror by Electric Boat was made no later than two years after the forklift was manufactured. We conclude that, based on this evidence, the trial court was within its discretion in determining that any danger of confusing the jury was minimal and outweighed by the probative value of the modifications.

that these arguments relate more to the weight of the evidence, than its relevance. Although the modifications made by Electric Boat were not determinative of the issue of a safer, alternative design, they were some evidence of the availability and feasibility of such a design.

The defendants also argue that, even if the changes made by Electric Boat are relevant to the feasibility of a safer, alternative design, they were improperly admitted because feasibility must be controverted before evidence regarding feasibility may be admitted. In support of this argument, the defendants rely on rule 407 of the Federal Rules of Evidence.[22] Under rule 407, subsequent remedial measures are generally excluded in negligence actions. As an exception to rule 407, subsequent remedial measures may be admitted in a negligence action on the issue of feasibility if feasibility has been controverted. The federal circuits are not in agreement on the issue of whether the rule excluding evidence of subsequent remedial measures should be extended to strict liability actions. See 2 American Law of Products Liability (3d Ed. 1987 & Sup. 1997) §§ 17:82 through 17:85, and cases cited therein. Considering that Connecticut does not apply the rule excluding evidence of subsequent remedial measures in strict liability actions, we know of no justification for requiring that feasibility be controverted before evidence regarding feasibility may be introduced. We conclude, therefore, that the

[22] Rule 407 of the Federal Rules of Evidence provides: "Subsequent Remedial Measures

"When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment."

trial court did not abuse its discretion in admitting evidence of Electric Boat's postaccident remedial modifications on the issue of the feasibility of a safer, alternative design.[23]

## IV

Because we reverse the judgment of the trial court and order a new trial, we turn to the plaintiff's claim that the trial court improperly refused to submit the issue of punitive damages to the jury. The plaintiff raises this issue pursuant to Practice Book § 4013 (a) (1) (B), which provides that an appellee may "present for review adverse rulings or decisions of the court which should be considered on appeal in the event the appellant is awarded a new trial . . . ." The plaintiff argues that there was sufficient evidence of reckless conduct by the defendants to submit the issue to the jury. We disagree.

General Statutes § 52-240b provides that punitive damages may be awarded in a product liability action "if the claimant proves that the harm suffered was the result of the product seller's reckless disregard for the safety of product users, consumers or others who were injured by the product. . . ." "A trial court can certainly, and should not hesitate to, decide in a given case that the evidence proffered on the issue [of punitive damages] is insufficient to be submitted to a jury for its determination." *Champagne* v. *Raybestos-Manhattan, Inc.*, 212 Conn. 509, 562, 562 A.2d 1100 (1989).

In the amended complaint, the plaintiff alleged that the forklift was defective because it lacked a standard-

[23] Because we determine that the trial court did not abuse its discretion in admitting evidence of Electric Boat's postaccident modifications, we need not consider the defendants' final claim that the trial court should not have instructed the jury that the evidence was a factor for it to consider in determining whether the forklift was defective and whether a safer, alternative design was feasible. The defendants concede that this final claim tracks their objection to the introduction of evidence of the postaccident remedial measures.

ized system of safety devices sufficient to alert a forklift driver to the presence of a pedestrian and sufficient to alert a pedestrian to the presence of a forklift. The plaintiff further alleged that the defendants were aware of these defects and wilfully, wantonly and recklessly failed to eliminate the defects. Our review of the record reveals that there was insufficient evidence that the defendants acted with reckless disregard for the safety of others. Although evidence was presented that Clark was aware of the general dangers posed by forklifts to pedestrians, the plaintiff failed to present sufficient evidence to demonstrate that Clark's failure to install a standardized system of safety devices rose to the level of reckless conduct, when such devices were not universally accepted by the industry and were not required under applicable safety standards at the time the forklift was distributed. Without adequate evidence to support this required showing of recklessness, the trial court was warranted in not submitting the issue of punitive damages to the jury.

The judgment is reversed and the case is remanded for a new trial.

In this opinion NORCOTT and KATZ, Js., concurred.

CALLAHAN, C. J., concurring and dissenting. I concur in the majority opinion, except for part III, with which I respectfully disagree. In part III, the majority concludes that the trial court properly admitted evidence that, subsequent to the plaintiff's accident, his employer made modifications to the forklift that had injured the plaintiff.

The majority begins its analysis by asserting that, pursuant to our decision in *Sanderson* v. *Steve Snyder Enterprises, Inc.*, 196 Conn. 134, 148, 491 A.2d 389 (1985), evidence of subsequent remedial alterations "is admissible in a strict liability action on the issue of whether the product was defectively designed if the

remedial repairs are related to the alleged design defect." Although I agree that this is an accurate statement of the rule announced in *Sanderson,*[1] I believe that relying on *Sanderson,* particularly at the outset of the discussion, diverts attention from the real issue. *Sanderson* simply stands for the proposition that evidence of subsequent remedial measures by a defendant may be admitted in strict liability cases because the concerns that have motivated courts to exclude such evidence in negligence cases, i.e., deterring defendants from rectifying dangerous situations, are less applicable to strict liability cases. Those concerns are inapplicable, however, where, as here, the party taking remedial action is not a defendant. *Raymond* v. *Raymond Corp.,* 938 F.2d 1518, 1524 (1st Cir. 1991); *Pau* v. *Yosemite Park & Curry Co.,* 928 F.2d 880, 888 (9th Cir. 1991); *O'Dell* v. *Hercules, Inc.,* 904 F.2d 1194, 1204 (8th Cir. 1990); *Causey* v. *Zinke,* 871 F.2d 812, 816–17 (9th Cir.), cert. denied, 493 U.S. 917, 110 S. Ct. 277, 107 L. Ed. 2d 258 (1989); *Koonce* v. *Quaker Safety Products & Mfg. Co.,* 798 F.2d 700, 719–20 (5th Cir. 1986); *Grenada Steel Industries, Inc.* v. *Alabama Oxygen Co.,* 695 F.2d 883, 889 (5th Cir. 1983).

Because the policy concerns that have sparked the substantial debate regarding the admissibility of evidence of subsequent remedial measures are inapplicable here, the issue of the admissibility of the employer's changes to the allegedly defective product becomes a routine evidentiary question. See *Raymond* v. *Raymond Corp.,* supra, 938 F.2d 1524; *Leaphart* v. *Whiting Corp.,* 387 Pa. Super. 253, 268–69, 564 A.2d 165 (1989), appeal denied, 525 Pa. 619, 577 A.2d 890 (1990); *Cyr* v. *J.I. Case Co.,* 652 A.2d 685, 694 (N.H. 1994). In order for evidence to be admissible, it must be relevant and its

[1] Although my research reveals that the rule announced in *Sanderson* represents the minority viewpoint nationwide, I express no opinion about the wisdom of our continued use of that rule.

probative value must outweigh its prejudicial effect. *State* v. *Porter*, 241 Conn. 57, 90, 698 A.2d 739 (1997).

Even assuming, without deciding, that evidence that the plaintiff's employer, in the wake of the plaintiff's accident, added a strobe light and a mirror to the forklift may be marginally relevant to the issue of whether the original forklift was unreasonably unsafe or whether modifications to the product were feasible; but see *Gauthier* v. *AMF, Inc.*, 788 F.2d 634, 637 (9th Cir.), modified, 805 F.2d 337 (9th Cir. 1986) (subsequent modifications by third party irrelevant to whether product was reasonably safe at time made); *Leaphart* v. *Whiting Corp.*, supra, 387 Pa. Super. 268–69 (fact that third party alters product after accident not necessarily probative or relevant to issue of whether product was defective); I would conclude that the evidence's limited probative value is outweighed by its prejudicial effect. "The jury's attention should [have been] directed to whether the [forklift] was reasonably safe at the time it was manufactured. . . . [T]here was ample expert testimony concerning that very point. The introduction of evidence about subsequent changes in the product or its design threaten[ed] to confuse the jury by diverting its attention from whether the product was defective at the relevant time to what was done later." *Grenada Steel Industries, Inc.* v. *Alabama Oxygen Co.*, supra, 695 F.2d 888.

Even if we assume, arguendo, that the addition by the plaintiff's employer of a light and a mirror to a vehicle already equipped with a backup alarm, two overhead flashing lights, rear backup lights, front and rear directional lights, a rearview mirror and a left side mirror is of some relevance to the issue of whether the forklift, as it existed when manufactured, was *unreasonably* unsafe, it is ambiguous. The employer may have made the modifications because of pressure from a union or to appease concerned workers in the wake of

a terrible tragedy. See *Leaphart* v. *Whiting Corp.*, supra, 387 Pa. Super. 268–69. The employees who testified regarding the changes to the forklift provided little testimony regarding the reasons for the changes. Moreover, even if the employer made the changes solely because it believed the original model to be unreasonably unsafe; id.; there is still a significant risk that the employer's opinion of the safety of the forklift might be given undue weight by the jury or that the jury might be confused as to the appropriate use of such evidence. The risk that the jury would use this evidence as a strong indication that the original model was unreasonably unsafe, when the evidence does not necessarily support that inference, strikes me as too high and I believe that the evidence should have been excluded. See *Grenada Steel Industries, Inc.* v. *Alabama Oxygen Co.*, supra, 695 F.2d 889 (danger of misleading or confusing jury); *Cyr* v. *J.I. Case Co.*, supra, 652 A.2d 694 (probative value outweighed by prejudicial effect).

I respectfully dissent from part III of the majority opinion.

MCDONALD, J., concurring and dissenting. I concur in parts I and IV of the majority opinion. I respectfully dissent, however, as to parts II and III. With respect to part III, I agree with the concurring and dissenting opinion of Chief Justice Callahan.

I also believe that it is unnecessary to reverse the trial court's decision not to instruct the jury that the defendant's compliance with a regulation promulgated under the Occupational Safety and Health Act (OSHA) is a factor in determining its liability. "OSHA safety regulations are promulgated to ensure workplace, not consumer, safety." *McKinnon* v. *Skil Corp.*, 638 F.2d 270, 275 (1st Cir. 1981); see also *Minichello* v. *U.S. Industries, Inc.*, 756 F.2d 26, 29 (6th Cir. 1985); *Widson* v. *International Harvester Co.*, 153 Cal. App. 3d 45,

51–52, 200 Cal. Rptr. 136 (1984); *C & K Lord, Inc.* v. *Carter*, 74 Md. App. 68, 92, 536 A.2d 699 (1988); *Behanan* v. *Desco Distribution Co.*, 98 Ohio App. 3d 23, 26, 647 N.E.2d 830 (1994), cert. denied, 71 Ohio St. 3d 1480, 645 N.E.2d 1259 (1995); *Tuggle* v. *Raymond Corp.*, 868 S.W.2d 621, 625 (Tenn. App. 1992). This case, between a party injured by a forklift and the manufacturer of the forklift, should not concern OSHA regulations.

I, therefore, respectfully dissent.